## IN THE UNITED STATES DISTRICT COURT FOR
## THE MIDDLE DISTRICT OF PENNSYLVANIA
## HARRISBURG DIVISION

|  |  |  |
|---|---|---|
| JUDICIAL WATCH, INC., | : | NO. 1:120-cv-00708 |
|  | : | (Judge Christopher C. Conner) |
| Plaintiff, | : |  |
|  | : |  |
| v. | : |  |
|  | : |  |
| COMMONWEALTH of | : |  |
| PENNSYLVANIA, et al., | : |  |
|  | : |  |
| Defendants. | : |  |

## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION TO DISMISS OF THE COUNTY DEFENDANTS

# **TABLE OF CONTENTS**

I.   QUESTIONS PRESENTED ..............................................................2

II.  JUDICIAL WATCH'S COMPLAINT.............................................3

III. PROCEDURAL HISTORY ..............................................................6

IV.  ARGUMENT..................................................................................6

    A.   The Court Should Dismiss Count I Because the Documents and
        Figures Judicial Watch Relies Upon Make Its Accusations of
        Wrongdoing Utterly Implausible .........................................................6

        1.   Three Ambiguous Cells of the EAC Spreadsheet Cannot
                Plausibly Support Judicial Watch's Claims................................7

        2.   Because Judicial Watch's "Census Data" Appears to be
                Conjured From Thin Air, It Also Does Not Plausibly
                Support Count I of the Complaint............................................15

    B.   Count II's Claims Against Chester and Delaware Counties
        Must Be Dismissed Because Judicial Watch Failed to Comply
        With the NVRA's Pre-Suit Notice Requirement ...............................16

V.   CONCLUSION.............................................................................20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*American Civil Rights Union v. Philadelphia City Commissioners*,
  872 F.3d 175 (3d Cir. 2017) .............................................................11

*Bellitto v. Snipes*,
  221 F.Supp.3d 1354 (S.D. Fla. 2016)..........................................7, 19

*Bellitto v. Snipes*,
  268 F.Supp.3d 1328 (S.D. Fla. 2017)........................................ 18, 19

*In re Burlington Coat Factory Securities Litigation*,
  114 F.3d 1410 (3d Cir. 1997) .......................................................8, 12

*Burtch v. Milberg Factors, Inc.*,
  662 F.3d 212 (3d Cir. 2011) ...............................................................14

*Davis v. Abington Memorial Hosp.*,
  765 F.3d 236 (3d Cir. 2014) ...............................................................14

*Georgia State Conference of NAACP v. Kemp*,
  841 F.Supp.2d 1320 (N.D. Ga. 2012)................................................18

*National Council of La Raza v. Cegavske*,
  800 F.3d 1032 (9th Cir. 2015) ...........................................................19

*Public Interest Legal Foundation, Inc. v. Winfrey*,
  No. 19-13638, 2020 WL 2781826 (E.D. Mich. May, 28, 2020).........7

*Public Interest Legal Foundation v. Boockvar*,
  370 F.Supp.3d 449 (M.D. Pa. 2019)...........................................*passim*

*Scott v. Schedler*,
  771 F.3d 831 (5th Cir. 2014) .............................................................19

**Statutes**

52 U.S.C. §§ 20501 *et seq*...................................................................passim

52 U.S.C.A. § 20510(b)(2)-(3)................................................................17

52 U.S.C. § 20507(i) ...................................................................16, 17, 18, 19

52 U.S.C. § 20507(a)(4)...................................................................3, 11, 16

52 U.S.C. § 20507(b) ....................................................................................11

52 U.S.C. § 20507(c) and (d) ...................................................................... 11

52 U.S.C. § 20510(b)(1) ...............................................................................16

52 U.S.C. § 205010(b) ..................................................................................17

## Other Authorities

11 C.F.R. § 9428.7 ..........................................................................................8

11 C.F.R. § 9428.7(b)(5)...............................................................................10

2017 DOS Report, available at
https://www.dos.pa.gov/VotingElections/CandidatesCommittees/R
unningforOffice/Documents/2017%20Annual%20Report_final.pdf............4, 12

2018 DOS Report, available at
https://www.dos.pa.gov/VotingElections/OtherServicesEvents/Vot
ingElectionStatistics/Documents/Annual%20Reports%20on%20V
oter%20Registration/2018%20ANNUAL%20REPORT.pdf........................4, 12

2019 DOS Report, available at
https://www.dos.pa.gov/VotingElections/OtherServicesEvents/Vot
ingElectionStatistics/Documents/Annual%20Reports%20on%20V
oter%20Registration/2019%20ANNUAL%20REPORT.pdf............................13

EAVS Datasets Version 1.2 (released February 18, 2020), EAC
    Spreadsheet, available at https://www.eac.gov/research-and-
    data/datasets-codebooks-and-surveys...................................................8

Federal Rule of Civil Procedure 12(b)(6) ...................................... 2, 7, 20

In its Complaint, Judicial Watch, Inc. presents itself as a diligent monitor of election officials' compliance with their obligations to maintain voter registration lists under the National Voter Registration Act ("NVRA"), 52 U.S.C. §§ 20501 *et seq.* In this role, Judicial Watch alleges, it expressed concerns about the NVRA list maintenance practices of election officials of Bucks, Chester, and Delaware Counties;[1] gave those officials an opportunity to respond to those concerns; and fairly considered those responses before filing this lawsuit. The documents that Judicial Watch includes and relies upon in its Complaint, however, tell a different story. They show that Judicial Watch purported to infer wrongdoing from data that did not support that inference; sent the Defendants murky and confusing letters that obscured the basis for Judicial Watch's accusations; ignored the County Defendants' detailed responses, which included official documents establishing that Judicial Watch's allegations were incorrect; and declined to follow up with the County Defendants, even when invited to do so. Instead, Judicial Watch charged

---

[1] Defendants Bucks County Commission, Bucks County Board of Elections, Bucks County Registration Commission, Thomas Freitag, in his official capacity as Elections Director for Bucks County, Chester County Commission, Chester County Board of Elections, Chester County Registration Commission, Sandra Burke, in her official capacity as Director of Elections in Chester County, Delaware County Council, Delaware County Board of Elections, Delaware County Registration Commission, and Laureen Hagan, in her official capacity as Chief Clerk, Elections Bureau for Delaware County, are referred to herein as the "County Defendants."

into this Court, in the midst of a pandemic and on the eve of an extraordinarily challenging primary election, with allegations that are disproven by the very documents Judicial Watch relies upon.

In its haste to file a lawsuit, Judicial Watch has neglected to set forth a plausible claim of an NVRA violation by any of the County Defendants or to provide the County Defendants with the statutory notice that the NVRA requires. Accordingly, pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court should dismiss Judicial Watch's claims against the County Defendants.

## I.     QUESTIONS PRESENTED

Should the Court dismiss Count I of the Complaint as to the County Defendants because Judicial Watch's claims of NVRA violations are, in light of the documents that Judicial Watch relies upon, completely implausible? *Suggested Answer:  Yes.*

Should the Court dismiss Count II of the Complaint as to Chester and Delaware County because Judicial Watch did not give the notice required by the NVRA? *Suggested Answer:  Yes.*

## II.   JUDICIAL WATCH'S COMPLAINT[2]

Judicial Watch alleges that on December 11, 2019, it sent letters to Bucks, Chester, and Delaware Counties and the Secretary of the Commonwealth of Pennsylvania, alleging that each of the three counties had failed to comply with NVRA list maintenance requirements.  *See* Complaint ¶ 59 & Exs. 1-3.  According to these letters, Judicial Watch had concluded that each county had violated the requirement that it "conduct a general program that makes a reasonable effort to remove the names of ineligible voters" when that ineligibility arises from death or a change of address.  52 U.S.C. § 20507(a)(4).  First, the letters stated, the Commonwealth had reported numbers in response to "survey question A9e" of its biennial report to the U.S. Election Assistance Commission ("EAC") that, "if accurate," would indicate a low number of a certain type of removal from each county's registration lists.  Second, the letters continued, the counties had "high registration rates."  *See* Complaint Exs. 1-3 at 2.

Judicial Watch's letters contained little explanation of these allegations. Judicial Watch did not provide a copy of the "survey question A9e" data or the

---

[2] On a Motion to Dismiss, this Court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."  *Public Interest Legal Foundation v. Boockvar*, 370 F.Supp.3d 449, 453-54 (M.D. Pa. 2019) (J. Conner) (internal quotation and citations omitted).

numbers it had compared to conclude that the counties had "high registration rates"; links in the letters' footnotes went to deleted or inactive websites. *See* Complaint Exs. 1-3 at 2 n.4-5, Ex. 4 at 3 ("The websites cited in footnotes 4 and 5 of your letter are inactive, non-exist[e]nt, or simply are not what you describe them to be ….").  Nonetheless, Judicial Watch demanded that each county provide extensive documents and other information, and asserted that if it did not receive this information within two weeks, by December 25, 2019, it would deem that failure to be an "independent violation" of the NVRA.  Complaint Exs. 1-3 at 3.

The letters were met with puzzlement, followed by compelling evidence that Judicial Watch was wrong:

- Chester County responded to Judicial Watch within a week, with links to detailed Pennsylvania Department of State annual reports (the "DOS Reports").  *See* Complaint Ex. 7 at 1.  Appendix D to these reports, which Chester County attached to its letter (but, tellingly, Judicial Watch does not attach to its Complaint), contained breakdowns of how many registrations each county had removed for various reasons during 2017 and 2018.[3]  Chester County followed up with a point by point response to each of Judicial Watch's document requests, providing documents and

---

[3] The 2017 DOS Report is attached as Exhibit 1, and is also available at https://www.dos.pa.gov/VotingElections/CandidatesCommittees/RunningforOffice/Documents/2017%20Annual%20Report_final.pdf.  The 2018 Report is attached as Exhibit 2, and is also available at https://www.dos.pa.gov/VotingElections/OtherServicesEvents/VotingElectionStatistics/Documents/Annual%20Reports%20on%20Voter%20Registration/2018%20ANNUAL%20REPORT.pdf.

links.  Complaint Ex. 8.  Judicial Watch does not allege that it responded to either of Chester County's letters.

- The Commonwealth also sent links to the DOS Reports and told Judicial Watch that its figures were wrong.  Complaint Ex. 9.  Again, Judicial Watch does not allege that it responded.

- Bucks County responded with a four-page letter that also linked to the DOS Reports and explained the County's list maintenance practices in detail.  Complaint Ex. 4.  Additionally, Bucks County invited Judicial Watch to visit the Bucks County Board of Elections to inspect and make copies of relevant records.  *Id.*  After Judicial Watch responded with more questions, Bucks County sent another letter, on March 20, 2020, explaining that because of the COVID-19 pandemic and the upcoming election, the county would not be able to respond for some time, but that it would attempt to make documents available to Judicial Watch for inspection.  Complaint Ex. 6.  This letter also noted that while access to the Bucks County Board of Elections office was changing rapidly due to COVID-19, to the extent possible in light of this this situation Judicial Watch would still be welcome to visit the office to inspect records.  Judicial Watch did not accept Bucks County's invitations to examine the documents.

As discussed *infra* § IV.A.1, the DOS Reports provided all the information Judicial Watch purported to seek, and demonstrated that allegations of failure to cull inactive registration lists were incorrect.  Nonetheless, Judicial Watch filed its Complaint.[4]

---

[4] Judicial Watch's haste came at a cost.  The County Defendants understand that the Commonwealth has recently determined that the "survey question A9e" data, as well as responses to other categories, was, in fact, inaccurate, and has corrected that data with the EAC.  *See* Answer and Affirmative Defenses of Defendants Commonwealth of Pennsylvania and Kathy Boockvar (Doc. 33), ¶¶ 39-41, Ex. A.  The Commonwealth now reports much higher numbers of removals by each of the three counties.  *Id.*  If Judicial Watch had given a better explanation of its position in the first place, or if it had waited until after the 2020 primary

## III.   PROCEDURAL HISTORY

Judicial Watch filed its Complaint on April 29, 2020, and all Defendants waived service of a summons.  On May 11, 2020 non-parties Common Cause Pennsylvania and League of Women Voters of Pennsylvania filed a Motion to Intervene as Defendants and for Leave to File Answer on the Same Schedule as Defendants.  Judicial Watch filed a Memorandum of Law in Opposition to the Motion to Intervene on May 26, 2020 and the County Defendants filed a Memorandum of Law in Support of the Motion to Intervene on June 9, 2020. Common Cause Pennsylvania and League of Women Voters of Pennsylvania filed a Reply Brief in Support of their Motion to Intervene on June 9, 2020, and Judicial Watch filed a Memorandum of Law in Further Opposition to the Motion to Intervene on June 22, 2020.  The Motion to Intervene has not yet been ruled on.

## IV.   ARGUMENT

### A.   The Court Should Dismiss Count I Because the Documents and Figures Judicial Watch Relies Upon Make Its Accusations of Wrongdoing Utterly Implausible

The Complaint in this case does not point to a single erroneous registration on the rolls of any County Defendant.[5]  Instead, Judicial Watch relies entirely on

---

election to proceed, it could have reduced or avoided the distraction and expense of this lawsuit.

[5] NVRA lawsuits, including those brought by Judicial Watch, frequently include such allegations.  *See, e.g.,* Ex. 1 to Declaration of Robert D. Popper, ECF No. 15, at 12 (Complaint in *Judicial Watch, Inc., v. North Carolina*, No. 3:20-cv-

the "survey question A9e" data—three spreadsheet cells that, in the context of their

source and of the other documents cited in the Complaint, do not plausibly support

Judicial Watch's claims—and "registration rates" that appear to have been created

from thin air.  Because these straws are far too weak to sustain the claims asserted

against the County Defendants in Count I, the Court should dismiss them pursuant

to Fed. R. Civ. P. 12(b)(6).

### 1.    Three Ambiguous Cells of the EAC Spreadsheet Cannot Plausibly Support Judicial Watch's Claims

The contents of three spreadsheet cells form the heart of Judicial Watch's

allegations.  These cells appear in a massive spreadsheet of data released in

connection with the 2018 version of the biennial report to Congress of the Election

Assistance Commission (the "EAC Spreadsheet").  Judicial Watch tells the Court

where to find the spreadsheet online, but makes no attempt to attach the

---

211 (W.D.N.C.) (alleging inactive registrations remaining on rolls for more than three general elections)); *Public Interest Legal Foundation, Inc. v. Winfrey*, No. 19-13638, 2020 WL 2781826, *1 (E.D. Mich. May, 28, 2020) ("The plaintiff alleges…isolated discrepancies in some registrations identified by the plaintiff's own audit of voting records…purportedly duplicative registrations of two or three persons identified by the plaintiff as having the same names…[and] that [the plaintiff] sent the City a report identifying 2,503 registrations of persons whose names the plaintiff had matched with Social Security Administration and other records indicating that persons with those names were deceased."); *Bellitto v. Snipes*, 221 F.Supp.3d 1354, 1365 ("Plaintiff alleges that…Defendant has received information regarding over 200 registered voters who have either died or who no longer reside in the community.").

spreadsheet or even to set forth its relevant data.  Instead, it recites the contents of

three cells and declares that those cells, alone, constitute an "admission" by the

County Defendants that they have violated the NVRA.  *See* Complaint ¶¶ 35-41 &

Heading B.

The EAC Spreadsheet itself,[6] however, tells a different story.  The

Pennsylvania section of the EAC Spreadsheet sets forth county-by-county statistics

on a host of election-related issues, including registration and list maintenance.  As

Judicial Watch admits, the County Defendants did not provide this data to the

EAC; it came from the Commonwealth.  *See* Complaint ¶¶ 39-41; 11 C.F.R. §

9428.7 (requiring only the "chief state election official" to provide information to

EAC).

In Exhibit 3 to this Motion, the County Defendants have set forth the EAC

Spreadsheet data relevant to this action, along with the corresponding survey

---

[6]  As Judicial Watch alleges, Complaint ¶ 35, the EAC Spreadsheet is
available at https://www.eac.gov/research-and-data/datasets-codebooks-and-
surveys, by clicking on "EAVS Datasets Version 1.2 (released February 18,
2020)."  The Court may consider data included in the EAC Spreadsheet that is not
specifically alleged in the Complaint, because the EAC Spreadsheet is a document
that is "integral to" and "explicitly relied upon in the complaint."  *In re Burlington
Coat Factory Securities Litigation*, 114 F.3d 1410, 1426 (3d Cir. 1997) (internal
modifications omitted).  See also, *Public Interest Legal Foundation*, 370 F.Supp.3d
at 454 ("In addition to reviewing the facts contained in the complaint, the court
may also consider matters of public record, orders, exhibits attached to the
complaint and items appearing in the record of the case.").

questions.[7]  This data includes responses to the following questions from the

EAC's survey:

- *Survey Question A1:  Registration numbers, broken down by active and inactive voters.*  These responses show that as of the November 2018 general election, each of the County Defendants had tens of thousands of "inactive" registrations; together, the three counties had placed more than 100,000 registrations into inactive status.

- *Survey Question A8:  Numbers of notifications sent to voters because "there is an indication" that the registrant has moved, or because the voter has not recently voted.*  These responses show that between the close of the voter registration periods in 2016 and 2018, the County Defendants sent out tens of thousands of notices.

- *Survey Question A9:  Numbers of voters removed from registration rolls.*  These numbers indicate thousands of removals from the rolls of each County Defendant (13,960 for Bucks, 9,516 for Chester, and 12,376 for Delaware) during the relevant period.

Survey Question A9 is broken into a number of subparts: "Moved outside

jurisdiction," "Death," "Disqualifying felony conviction," "Failure to respond to

notice sent and failure to vote in two most recent federal elections," "Declared

mentally incompetent," "Voter request to be removed for reasons other than those

listed above," and "Other."  The survey does not explain how responding states are

to allocate their data among these categories.  The Code of Federal Regulations

---

[7] As Judicial Watch alleges, Complaint ¶ 35, the survey questions may be found at https://www.eac.gov/research-and-data/datasets-codebooks-and-surveys, by clicking on "2018 Election Administration and Voting Survey Instrument." Except where otherwise indicated, the survey responses cover the two-year period from October 2016 to October 2018.

also provides no guidance on this point; it requires states to report only "[t]he *total number of registrations statewide that were, *for whatever reason*, deleted from the registration list …"  11 C.F.R. § 9428.7(b)(5) (emphasis supplied).  According to the EAC Spreadsheet entries for Bucks, Chester and Delaware Counties, the Commonwealth reported thousands of removals in response to each of the "moved outside jurisdiction" and "death" subparts (questions A9b and A9c), hundreds of removals in the "other voter request" subpart for Bucks County (question A9g), several hundred removals in an unspecified "other" subpart (question A9h), and only a handful of removals in the "Failure to respond to notice sent and failure to vote in two most recent federal elections" subpart (question A9e).

According to Judicial Watch, this last category, the responses to Question A9e on the EAC Spreadsheet, constitutes an admission that the County Defendants are "not complying with Section 8(d)(2) of the NVRA."  Complaint ¶ 37.  This is not a plausible assertion.  For a number of reasons, these three numbers cannot do the work that Judicial Watch asks them to do, and cannot sustain Count I.

First, the EAC Spreadsheet shows that the County Defendants have engaged in extensive list maintenance activity, sending tens of thousands of notices and removing thousands of voters from the registration rolls during the relative time period.  In light of all this activity, the three numbers Judicial Watch identifies

cannot plausibly show that the County Defendants have ignored their responsibility to make reasonable efforts to comply with the NVRA.

Second, nothing in the EAC Spreadsheet, the EAC's survey, or the Code of Federal Regulations mandates that removals of registrations that were subject to the procedures of Section 8(d)(2) be reported in the "failure to respond" column, rather than one of the other categories.  This makes sense, because the NVRA does not require states to utilize Section 8(d)(2) as a removal method at all.  "[T]he NVRA both protects registered voters from improper removal from the rolls and places limited requirements on states to remove ineligible voters from the rolls." *American Civil Rights Union v. Philadelphia City Commissioners*, 872 F.3d 175, 179 (3d Cir. 2017).  The statute requires only that states make a "reasonable effort" to remove voters from the rolls who fall into two categories of ineligibility – voters who have died and voters who have moved outside of the jurisdiction.  52 U.S.C. § 20507(a)(4).  Subsections (b), (c), and (d) provide a few guiding mandates for how states may go about these efforts, such as requiring that voter removal programs be "uniform, nondiscriminatory, and in compliance with the Voting Rights Act," 52 U.S.C. § 20507(b), and set forth some examples of appropriate programming, 52 U.S.C. § 20507(c) and (d).  The procedure in Section 8(d)(2) may be used in pursuit of a state's "reasonable efforts" to remove voters who have moved or died, but its use is not required.  Therefore, it is not reasonable to assume, as Judicial

Watch does in its Complaint, that a state or county will use Section 8(d)(2)

procedures at all, that it will report the results of those procedures in a particular

column, or that low numbers in a particular column of the EAC Spreadsheet mean

that the state is not in compliance with the NVRA.

Third, the Complaint explicitly refers to and discusses the DOS Reports,

which confirm that all three County Defendants engaged in robust voter protection

efforts, including thousands of removals of inactive registrations.[8]  *See* Complaint

¶¶ 63-65, 70-71, 81 & Exhibits 4 at 1, 5 at 2, 7 at 1, & 9 at 1-2 (discussing the DOS

Reports for calendar years 2017 and 2018); *see* Exs. 1, 2 (2017 and 2018 DOS

Reports).  Unlike the EAC Spreadsheet, the DOS Reports are designed to reflect

list maintenance activities that Pennsylvania carries out, rather than to

accommodate the various types of list maintenance activities conducted

nationwide.  The Reports show that in calendar year 2017, Bucks, Chester, and

Delaware Counties cancelled 15,827, 11,647, and 21,134 inactive registrations,

respectively, on the basis that the voters "did not respond to mailing after two

federal elections elapsed."  *See* Ex. 2 at 7, 35.  In calendar year 2018, these

---

[8] Because the Complaint purports to rely on information from these Reports
(albeit incorrectly, as discussed below), the Court may consider them in connection
with this Motion to Dismiss.  *See In re Burlington Coat Factory Securities
Litigation*, 114 F.3d at 1426; *see also Public Interest Legal Foundation*, 370
F.Supp.3d at 454.

numbers were 3,878, 499, and 433 registrations, respectively.[9]   *See* Ex. 3 at 8,

37.[10]

Thus, the very documents that Judicial Watch relies upon demonstrate that

its allegations regarding the three EAC Spreadsheet cells make no sense.

Whatever these three numbers mean, they cannot be read to indicate that the

County Defendants have not made reasonable efforts to cull their registration

lists.[11]   "'To survive a motion to dismiss, a complaint must contain sufficient

---

[9] Because federal elections, which take place in even numbered years,
trigger these cancellations, the bulk of cancellation activity in this category occurs
in odd numbered years.  The recently released DOS Report for 2019, for example,
shows that Bucks, Chester and Delaware Counties cancelled 10,167, 11,818, and
10,727 registrations, respectively, on this basis.  *See*
https://www.dos.pa.gov/VotingElections/OtherServicesEvents/VotingElectionStati
stics/Documents/Annual%20Reports%20on%20Voter%20Registration/2019%20A
NNUAL%20REPORT.pdf at 8, 34.

[10] Judicial Watch tries to call the Reports into question by stating that they
give a single number for all removals from inactive voter lists, without explaining
the reasons for these removals.  *See* Complaint ¶¶ 63, 70, 81.  This is simply not
true.  The Reports divide removals of inactive registrations into eight categories,
and include a key explaining what each category means.  *See* Ex. 2 at 7, 35; Ex. 3
at 8, 37.

[11] Because the County Defendants were not involved in the
Commonwealth's report to the EAC, they cannot explain where these numbers
came from or what they were intended to represent.  However, the County
Defendants understand that the Commonwealth has recently determined that these
numbers, and other figures in the EAC Spreadsheet, are inaccurate, and that the
Commonwealth has submitted revised figures to the EAC that show a much higher
number of cancellations, as discussed *supra* 5 n.4.  Specifically, the
Commonwealth now reports in response to "survey question A9e" that Bucks,
Chester, and Delaware Counties removed 15,714, 11,519, and 20,968 registrations,

factual matter, accepted as true, to state a claim to relief that is plausible on its face.' 'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Davis v. Abington Memorial Hosp.*, 765 F.3d 236, 240-41 (3d Cir. 2014) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  Here, no such "reasonable inference" can be drawn from these three numbers.  *See, e.g. Burch v. Milberg Factors, Inc.*, 662 F.3d 212, 225-30 (3d Cir. 2011); *Davis*, 765 F.3d at 241-43.  "Determining whether a plausible claim has been pled is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Davis*, 765 F.3d at 242 (quoting *Iqbal*, 556 U.S. at 679).  In light of the full context provided by the EAC Spreadsheet, the three cells Judicial Watch zooms in on do not provide a plausible factual basis for the claims in Count I consistent with "common sense."

---

respectively, for "failure to respond to notice sent and failure to vote in two most recent federal elections" during the relevant time period.  Answer of Commonwealth and Boockvar, ¶¶ 39-41, Ex. A.

### 2. Because Judicial Watch's "Census Data" Appears to be Conjured From Thin Air, It Also Does Not Plausibly Support Count I of the Complaint

The only other factual basis that Judicial Watch offers in support of Count I[12] is that it has conducted an "analysis," using the "best available census data," that shows that Bucks, Chester, and Delaware Counties have registration rates of "about 96%," "about 97%," and "about 97%," respectively.  Complaint ¶¶ 51-58. Judicial Watch declines, however, to tell the Court or the Defendants what this "best available census data" is or where it may be found.[13]  Accordingly, the County Defendants and this Court have no way to assess whether the data Judicial Watch "analyzed" is up to date, geographically sound, or reliable.  Judicial Watch also does not explain whether its percentages are based on active registrations, or whether it has also included the County Defendants' more than 100,000 inactive registrations.  Before the Court could conclude that these percentages are at all significant, Judicial Watch would have to show, for example, whether its

---

[12] Judicial Watch also alleges that another county, Allegheny, was "delinquent" in removing inactive registrations.  Complaint ¶¶ 47-49.  Whether or not this is true, Allegheny County is not a Defendant here, and its list maintenance practices are irrelevant.

[13] The Complaint itself contains no description of this "best available census data."  In the notice letters attached to the Complaint, Judicial Watch directed the County Defendants to a dead link.  *See* Complaint Ex. 1-3 n.4.  Even after Bucks County complained that the link did not work, Judicial Watch did not provide, or even give a general description of, this "best available" data.  Complaint Ex. 4 at 3, Ex. 5.

calculations have accounted for the County Defendants' recent population growth or whether they include the tens of thousands of inactive voters who cannot be removed from the registration rolls until two federal elections have taken place. Without this information—or any other explanation—Judicial Watch's purported "registration rates," considered in the context of the rest of the Complaint and the EAC Spreadsheet data, are an insufficient factual basis to support Count I, even viewing these allegations in the light most favorable to Judicial Watch.

### B.   Count II's Claims Against Chester and Delaware Counties Must Be Dismissed Because Judicial Watch Failed to Comply With the NVRA's Pre-Suit Notice Requirement

In Judicial Watch's December 11, 2019 letters to Chester and Delaware Counties, it requested records falling into eight categories, including several multi-part categories, pursuant to 52 U.S.C. § 20507(i).  Complaint, ¶¶ 59-62, 101-105, Exs. 2-3.  Chester County responded by letter two separate times, challenging Judicial Watch's assertions that it was in violation of subsection 20507(a)(4) and providing several types of records in response to Judicial Watch's specific requests.  Complaint, Exs. 7 and 8.[14]  During the four-plus months before Judicial Watch filed suit, the County Defendants' time, attention, and resources were taxed

---

[14] Exhibits 7 and 8 to the Complaint are not properly labeled with cover sheets but are filed as separate attachments to the Complaint, immediately following Exhibit 6.

to their limits as they worked overtime to meet the urgent and extraordinary demands of the unprecedented public health crisis caused by COVID-19, and simultaneously prepared to hold a primary election.  And yet Judicial Watch does not allege that it ever responded to Chester County's correspondence to explain how it fell short, or that it ever contacted either County again during this time period.  Judicial Watch's failure to notify Chester and Delaware Counties that they were purportedly in violation of subsection 20507(i) for not providing the records requested in the December 11 letters, and that Judicial Watch intended to commence litigation if the Counties did not correct this purported violation within 90 days, is fatal to these claims.  52 U.S.C. § 205010(b).

The NVRA requires that "written notice" of a purported violation be provided "to the chief election official of the State involved," and authorizes the commencement of litigation "[i]f the violation is not corrected within 90 days" of such notice.[15]  52 U.S.C. § 20510(b)(1), (2).  As this Court has explained, "[n]otice is a precondition to filing suit under the NVRA."  *Public Interest Legal Foundation*, 370 F.Supp.3d at 456-57 (dismissing subsection 20507(i) claim for failure to provide notice of purported violation to Pennsylvania chief election

---

[15] The application and length of the curative period depends on how many days prior to a federal election a purported NVRA violation occurs, 52 U.S.C.A. § 20510(b)(2)-(3); given the timing of the records requests and Judicial Watch's initiation of this litigation, the relevant curative period here is 90 days.

official prior to filing suit).  *See also, Bellitto v. Snipes*, 268 F.Supp.3d 1328, 1333-

35 (S.D. Fla. 2017) (dismissing subsection 20507(i) claim because plaintiff only

sent defendant a single correspondence requesting documents under the NVRA

and never notified defendant of purported NVRA violation after the request went

unfulfilled); *Georgia State Conference of NAACP v. Kemp*, 841 F.Supp.2d 1320,

1335 (N.D. Ga. 2012) (dismissing plaintiff from NVRA suit because he failed to

comply with notice requirement).  Notice is sufficient under Section 20510 "when

it (1) sets forth the reasons that a defendant purportedly failed to comply with the

NVRA, and (2) clearly communicates that a person is asserting a violation of the

NVRA and intends to commence litigation if the violation is not timely addressed."

*Public Interest Legal Foundation*, 370 F.Supp.3d at 456-57.

A violation of subsection 20507(i) occurs when a proper records request is

not complied with.  As such, notice setting forth the reasons that a defendant

purportedly failed to comply with subsection 20507(i) cannot be provided along

with the records request, as that would predate the purported failure.  Rather,

notice can only be provided after the request has been refused or ignored.  This is

the case even if proper notice of a different purported NVRA violation is given in

the same correspondence: "to allow a purported NVRA notice letter to serve such a

dual purpose—that is, make an initial request for records and at the same time

notify the records keeper of his or her failure to satisfy that request—simply

because it provides sufficient notice of a separate NVRA violation would…defy logic and frustrate the purpose of the NVRA's notice provision (to provide an opportunity to attempt compliance before litigation)." *Bellitto*, 268 F.Supp.3d at 1335.[16]

Here, the December 11, 2019 letters are clearly insufficient under the NVRA notice requirement, and this failing is fatal to Judicial Watch's subsection 20507(i) claims against Chester and Delaware Counties. Had Judicial Watch complied with the notice requirement, it might have avoided a drain on the Counties' and the Court's time and resources, in furtherance of the very purpose of the notice requirement: to allow a state the opportunity to cure a deficiency with its NVRA compliance before it is brought into resource-consuming litigation. In this case, Judicial Watch's failure to comply with the notice requirement is particularly egregious, because of the burden it places on counties that are carrying out election duties in the face of the extraordinary demands of the COVID-19 pandemic. Judicial Watch's disregard of the NVRA notice requirement for its subsection

---

[16] The court in *Bellitto* treated non-compliance with the NVRA pre-suit notice requirement as a jurisdictional bar. Most courts, however, consider it a matter of "statutory standing" relevant to whether a plaintiff has properly stated a claim under the NVRA. *See, e.g., National Council of La Raza v. Cegavske*, 800 F.3d 1032, 1042-45 (9th Cir. 2015); *Scott v. Schedler*, 771 F.3d 831, 836 (5th Cir. 2014).

20507(i) claims does not just doom Count II of its Complaint; it has harmed

Pennsylvania citizens.

## V.    CONCLUSION

For the foregoing reasons, the County Defendants respectfully ask the Court

to dismiss all claims asserted against them in the Complaint pursuant to Fed. R.

Civ. P. 12(b)(6).

Respectfully submitted,

HANGLEY ARONCHICK SEGAL
Date: July 10, 2020            PUDLIN & SCHILLER

By:    */s/ Mark A. Aronchick*
Mark A. Aronchick
Michele D. Hangley
Christina C. Matthias
One Logan Square, 27th Floor
Philadelphia, PA  19103
Telephone: (215) 496-7050
Email: maronchick@hangley.com

*Counsel for County Defendants*

## **CERTIFICATE OF WORD COUNT**

I, Mark A. Aronchick, hereby certify pursuant to Local Civil Rule 7.8(b)(2) that the text of the foregoing Memorandum of Law in Support of Motion to Dismiss contains 4,835 words as calculated by the word-count function of Microsoft Word, which is within the limit of 5,000 words set forth in Local Rule 7.8(b)(2).

Dated:  July 10, 2020                              */s/ Mark A. Aronchick*
                                                   Mark A. Aronchick

## **<u>CERTIFICATE OF SERVICE</u>**

I, Mark A. Aronchick, certify that on July 10, 2020, I caused a true and correct copy of the foregoing Motion to Dismiss to be electronically filed and served with the Court using the Electronic Case Filing System.

*/s/ Mark A. Aronchick*

Mark A. Aronchick
