IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

HARRISBURG DIVISION

JUDICIAL WATCH, INC.,

               Plaintiff,

    v.

COMMONWEALTH of
PENNSYLVANIA, et al.,

               Defendants.

Civ. Action No. 1:20-cv-00708-CCC

**PLAINTIFF JUDICIAL WATCH'S MEMORANDUM
OF LAW IN OPPOSITION TO THE COUNTY
<u>DEFENDANTS' MOTION TO DISMISS</u>**

## <u>TABLE OF CONTENTS</u>

<u>Page No.</u>

QUESTIONS PRESENTED......................................................................2

STATUTORY BACKGROUND.............................................................2

THE ALLEGATIONS IN THE COMPLAINT......................................5

COUNTY DEFENDANTS' MOTION TO DISMISS...........................12

STANDARDS ON A MOTION TO DISMISS.......................................13

ARGUMENT..........................................................................................15

    I.      COUNTY DEFENDANTS' FACTUAL DISPUTE
           ABOUT THE NUMBER OF SECTION 8(d)(2) REMOVALS
           IS NOT GROUNDS FOR DISMISSING THE
           COMPLAINT..................................................................15

           A.    THE STATE REPORTS SHOULD NOT BE
                  CONSIDERED IN DETERMINING THIS MOTION ...........15

           B.    PLAINTIFF DISPUTES THE ACCURACY OF THE
                  DATA IN THE STATE REPORTS .........................................17

           C.    PLAINTIFF DISPUTES THE *IMPORT* OF THE DATA
                  IN THE STATE REPORTS......................................................18

    II.     COUNTY DEFENDANTS FAIL TO SUCCESSFULLY
           CHALLENGE PLAINTIFF'S ALLEGATIONS REGARDING
           THE COUNTIES' HIGH REGISTRATION RATES.......................19

    III.    PLAINTIFF PROVIDED PROPER NOTICE OF ITS CLAIM
           UNDER SECTION 8(i) ...............................................................20

CONCLUSION.......................................................................................24

CERTIFICATE OF WORD COUNT.....................................................26

CERTIFICATE OF SERVICE ..............................................................27

## TABLE OF AUTHORITIES

**Cases**                                                                         **Page No.**

*ALA, Inc. v. CCAIR, Inc.,* 29 F.3d 855 (3d Cir. 1994) ............................................. 14

*Am. Civ. Rights Union v. Martinez*, 166 F. Supp. 3d 779
    (W.D. Tex 2015) ........................................................................................ 19

*Ashcroft v. Iqbal,* 556 U.S. 662 (2009) ............................................... 14, 15

*Ass'n of Cmty. Organizations for Reform Now v. Miller*129
    F.3d 833 (6th Cir. 1997) ......................................................................... 22

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2017) ...................................... 14, 15

*Bellitto v. Snipes, 268* F. Supp. 3d 1328 (S.D. Fla. 2017) .........................23

*Connelly v. Lane Constr. Corp.,* 809 F.3d 780 (3d Cir. 2016) .............................. 15

*Faulkner v. Beer,* 463 F.3d 310 (2d. Cir. 2006) ................................................ 17, 18

*Georgia State Conf. of the NAACP v. Kemp,* 841 F Supp. 2d 1320
    (N.D. Ga. 2012) ......................................................................................... 21, 23

*Husted v. A. Phillip Randolph Inst.,* 138 S. Ct. 1833 (2018) ........................3, 4, 19

*In re Ins. Brokerage Antitrust Litig.,* 618 F.3d 300 (3d Cir. 2010) ........................ 14

*In re Processed Egg Prods. Antitrust Litig.,* 821 F. Supp. 2d 709
    (E.D. Pa 2011) ...........................................................................14, 15, 16, 17

*Judicial Watch, Inc. v. King,* 993 F. Supp. 2d 2019
    (S.D. Ind. 2012) .......................................................................................22

*Judicial Watch, Inc. v. Lamone,* 399 F. Supp. 3d 425
    (D. Md. 2019) ............................................................................................22

*Mayer v. Belichick,* 605 F.3d 223 (3d Cir. 2010) .................................................. 15

*Public Interest Legal Foundation v. Boockvar,* 370 F. Supp. 449
    (M.D. Pa 2019) ..........................................................................................23

*Revell v. Port Auth. Of N.Y. & N.J.,* 598 F.3d 128 (3d Cir. 2010) ...................14, 17

*Schuchardt v. President of the United States,* 839 F.3d 336 (3d Cir. 2016) ..........15

*United States v. Missouri,* 335 F. 3d 844 (8th Cir. 2008) ..........................................6

*Voter Integrity Project N.C., Inc. v. Wake Cnty. Bd of Elections*,
    301 Supp. 3d 612 (E.D.N.C. 2017) ............................................................ 19

**Statutes**

52 U.S.C. § 20507(a) ...................................................................................... 3

52 U.S.C. § 20507(c) ......................................................................................4

52 U.S.C. § 20507(d) ...............................................................................*passim*

52 U.S.C. § 20508(a) .......................................................................................5

52 U.S.C. § 20510(b) ............................................................................7, 11, 20, 21

**Rules**

Fed. R. Civ. P. 12(b)(6) ............................................................................*passim*

Plaintiff Judicial Watch ("Plaintiff") submits this memorandum of law in opposition to the motion of the named defendants of Bucks, Chester, and Delaware Counties ("County Defendants") to dismiss the claims against them. (ECF No. 35.)

Plaintiff filed a complaint claiming that Defendants have not conducted a "reasonable" program to remove ineligible registrants from the federal voter rolls as required by federal law. The claims are complex and data driven, and rely to a considerable extent on data Defendants supplied to a federal agency.

County Defendants have now moved to dismiss for failure to state a claim. In so doing, however, they ignore the well-known standards that apply to a motion to dismiss, pursuant to which a favorable interpretation applies to all facts alleged and inferences in the complaint. They argue instead that Plaintiff's claims are "implausible," by which they seem to mean "not likely." In support of what is, essentially, a (flawed) factual argument, they cite data that was not previously provided to the federal agency, and has not been specifically cited before by any defendant, either in correspondence or pleadings. County Defendants then cite *different* data from the State Defendants' answer; attach State registration reports that have not previously been attached in full to any correspondence or pleading; and then attach a new chart of their own devising that contains *their* summary of data from the federal report.

- 1 -

Under the standards properly applying to a motion to dismiss for failure to state a claim, County Defendants' motion should be denied.

## QUESTIONS PRESENTED

1.     Whether the Court should dismiss claims in a complaint that are based on publicly available data, including data the defendants certified as true to a federal agency, by according superior weight to other data contained in documents created by the defendants, which documents were not relied on by the plaintiff and whose content is disputed both as to truth and relevance?

Suggested answer: No.

2.     Whether a letter providing notice of actionable violations of the National Voter Registration Act, requesting public records pursuant to the Act, and providing notice that the failure to provide those records would be deemed to be a further violation of the Act, provided statutory notice that failing to provide those records would be deemed to violate the Act?

Suggested answer: Yes.

## STATUTORY BACKGROUND

Section 8 of the National Voter Registration Act of 1993 (NVRA) provides that registrants may not be removed from federal voter rolls except "at the request of the registrant"; under a state law concerning a disqualifying "criminal conviction"; under a state law concerning "mental incapacity"; or because a

registrant has died or has moved away.  52 U.S.C. § 20507(a)(3).  With respect to the latter two categories, Section 8 requires each state to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of … the death of the registrant; or … a change in the residence of the registrant."  *Id.*, § 20507(a)(4).

If a registered voter is believed to have moved, Section 8(d) provides that his or her registration may only be cancelled in one of two ways.  First, the name of a registrant who confirms a change of address in writing may be removed from the rolls.  52 U.S.C. § 20507(d)(1)(A).  Second, if a registrant is sent a "postage prepaid and pre-addressed return card" by forwardable mail requesting address confirmation (the "Confirmation Notice"), "has failed to respond to [that] notice," and "has not voted or appeared to vote" for the next two consecutive general federal elections— basically, a period of from two to four years—that registrant must be removed from the rolls.  *Id.*, § 20507(d)(1)(B), (d)(2), (d)(3).

States have considerable leeway in defining the events that "trigger" the sending of the Confirmation Notices that start this process, and "States take a variety of approaches."  *Husted v. A. Philip Randolph Inst.*, 138 S. Ct. 1833, 1839 (2018) (citation omitted).  One approach is set out in Section 8(c) of the NVRA itself, which provides that states "may" establish a compliant program that sends Confirmation Notices to registrants if "change-of-address information supplied by the Postal

Service" shows they have moved out of the registrar's jurisdiction. 52 U.S.C. § 20507(c)(1)(B)(ii).[1]

Regardless of the trigger used to determine *when* to send Confirmation Notices, "the NVRA is clear about the need to send" them. *Husted*, 138 S. Ct. at 1839. In a word, "*[i]f the State does not send*" such a notice "or otherwise get written notice that the person has moved, *it may not remove* [a] registrant on change-of-residence grounds." *Id*. (emphasis added), citing § 20507(d)(1). Accordingly, County Defendants simply misstate the governing statutory law when they assert that "the NVRA does not require states to utilize Section 8(d)(2) as a removal method at all," or that the "procedure in Section 8(d)(2) may be used in pursuit of a state's 'reasonable efforts' to remove voters who have moved or died, but its use is not required." (ECF No. 35-1 at 11.) To the contrary, the plain language of Section 8(d)(2) establishes that the procedure it describes *must* be used in order to cancel the registrations of those who have moved.

It is important to remember that, under the Section 8(d)(2) process, a registration is designated as inactive long before it is removed from the registration list. Federal regulations define "Inactive voters" as "registrants who have been sent but have not responded to a confirmation mailing … and have not since offered to

---

[1]     A somewhat different procedure is used for registrants who move within a registrar's jurisdiction. *Id*., § 20507(c)(1)(B)(i).

vote." 11 C.F.R. § 9428.2(d).  Thus, registrants' listed registrations should become

inactive once they fail to respond to a Confirmation Notice.  Those registrations

should then remain inactive until they either (1) are removed after two federal

election cycles, or (2) become active again after registrants vote or contact the

registrar.  Thus, it makes no sense to refer, as Defendants do in their correspondence

with Plaintiff, to removing *active* registrations for failing to respond to a notice and

failing to vote.

## THE ALLEGATIONS IN THE COMPLAINT

The complaint alleges that Defendants have violated Section 8(a)(4) of the

NVRA by failing to conduct a general program that makes a reasonable effort to

remove the names of ineligible voters from federal voter rolls.  (ECF No. 1, ¶ 98

(Count I).)

The NVRA requires the U.S. Election Assistance Commission (EAC) to

submit to Congress in June of each odd-numbered year "a report assessing the

impact" of the law "on the administration of elections for Federal office during the

preceding 2-year period."  52 U.S.C. § 20508(a)(3).  Federal regulations require

states to provide registration data to the EAC for use in this biennial report.  11

C.F.R. § 9428.7.  (ECF No. 1, ¶ 26.)[2]  The complaint notes that the data Defendants

---

[2]     County Defendants complain that Plaintiff "tells the Court where to find the
[EAC] spreadsheet online, but makes no attempt to attach the spreadsheet or even to

provided to the EAC shows that Bucks, Chester and Delaware Counties, with a combined registration of over 1.2 million voters, removed an absurdly low total of seventeen (17) registrations in a two-year period under the procedure set forth in Section 8(d)(2). (*Id*., ¶¶ 38-42.) Defendants reported similarly low numbers of removals throughout the Commonwealth under that provision. (*Id*., ¶ 45.) Allegheny County particularly admitted its failure to conduct voter list maintenance. (*Id*., ¶¶ 47-49.)[3] The complaint alleges that the low number of removals "indicate a multi-year failure" by Defendants "to comply with a core requirement of Section 8 of the NVRA." (*Id*., ¶¶ 44, 46.)

The complaint also alleges that Plaintiff compared registration data in the EAC's report (which, it is worth emphasizing, was supplied to the EAC *by Defendants*) to publicly available data from the Census Bureau to conclude that Bucks, Chester, and Delaware Counties had total registration rates, respectively, of 96%, 97%, and 97%. (*Id*., ¶¶ 51-55.) The complaint alleges that these numbers are high, both within Pennsylvania and compared to the rest of the country, which

_____

set forth its relevant data." (*Id*. at 7-8.) The EAC spreadsheet in its original form contains 6,461 rows, each with 407 associated columns of data. It would not have been helpful to attach it to the complaint.

[3] Contrary to County Defendants' contention (ECF No. 35-1 at 15 n.12), Allegheny County's failure is not irrelevant to the claims in the complaint. A lack of local compliance "remains relevant to determining whether or not" a state "is reasonably 'conduct[ing] a general program'" of voter list maintenance. *United States v. Missouri*, 535 F.3d 844, 851 (8th Cir. 2008).

suggests a failure to remove outdated registrations.  (*Id.*, ¶¶ 56-58.)  These are all specific, nonconclusory allegations that may be tested in discovery and at trial.

Finally, the complaint alleges that Defendants violated Section 8(i) of the NVRA by failing to provide the "names and addresses of all persons to whom notices described in 52 U.S.C. § 20507(d)(2) were sent" along with the details of any response, which information Section 8(i)(2) specifically requires states to retain and produce.  (*Id.*, ¶¶ 75, 79, 83.)  In particular, Chester County stated that it "does not maintain and is not in possession, custody or control of these records," while Delaware County made no response at all.  (*Id.*, ¶¶ 75, 77.)[4]

On December 11, 2019, Plaintiff sent letters to each county and to Secretary Boockvar providing statutory notice, pursuant to 52 U.S.C. § 20510(b)(1), of violations of the NVRA.  (*Id.*, ¶¶ 59, 97, 102.)  Plaintiff's letters and the letters in response are attached to the complaint.

The County Defendants avoided answering the central allegation of the notice letters, identifying instead ambiguous and often simply irrelevant data contained in

---

[4]   Although Bucks County "declined" Plaintiff's "request for information pursuant to" Section 8(i)(2), Plaintiff was "invited to visit the Bucks County Board of Elections during office hours and inspect the records covered by that law."  (ECF No. 1-5 at 4.)  While the point of requiring an in-person visit is not clear, in light of this invitation the complaint makes no claim under Section 8(i) against Bucks County.

- 7 -

two reports generated by Defendants (and not reported to the EAC).[5]  It is important

to understand in detail the data the counties cited in their replies.

Bucks County claimed in a March 4, 2020 letter that in 2018 it cancelled

12,149 active voter registrations and 1,901 inactive registrations.  (ECF No. 1-5 at

1.)[6]  These numbers are found in the 2018 state report as Bucks County's totals in

two  side-by-side  charts  describing  "ACTIVE  VOTER  REGISTRATIONS

CANCELLED" and "INACTIVE VOTER REGISTRATIONS CANCELLED."

(ECF No. 35-3 at 37.)  Note at the outset that removals of *active* registrations must

be deemed irrelevant, because active registrations are not removed under Section

8(d)(2).  Further, the headings for *inactive* cancellations include, among other things,

removals attributed to "VOTER'S REQUEST," "VOTER'S DEATH," "OTHER

MOVE CONFIRM," "CANVASS," and "PENNDOT MOVE CONFIRM"—none

of which are removals under Section 8(d)(2) for failing to respond to a notice and

failing to vote for two elections.  (ECF No. 35-3 at 37.)  Plaintiff's March 9, 2020

---

[5]     THE ADMINISTRATION OF VOTER REGISTRATION IN PENNSYLVANIA, 2017
REPORT TO THE GENERAL ASSEMBLY, Pennsylvania Department of State, June 2018
(attached to County Defendants' motion as ECF No. 35-2); THE ADMINISTRATION
OF VOTER REGISTRATION IN PENNSYLVANIA, 2018 REPORT TO THE GENERAL
ASSEMBLY, Pennsylvania Department of State, June 2019 (ECF No. 35-3).

[6]     In the last sentence of the same paragraph, Bucks County asserts that it
"actually canceled 14,050 voters in 2018."  (ECF No. 1-5 at 1.)  This simply refers
to the sum of the 12,149 active and 1,901 inactive removals referred to in the first
sentence.

letter in response pointed out that the data cited by Bucks County did not address this important matter.  (ECF No. 1-6 at 2.)  The complaint specifically identifies these problems with the data.  (ECF No. 1, ¶ 63.)

One column in the State reports that might be taken to refer to Section 8(d)(2) removals is entitled "VOTER REMOVAL PROGRAM."  (ECF No. 35-3 at 37.)[7] Yet the meaning of this heading is made ambiguous because it appears in both the "active" and the "inactive" removal categories.  As explained above, Section 8(d)(2) should only lead to the removal of inactive registrations.   This anomaly is specifically identified in Plaintiff's March 9, 2020 response letter.  ECF No. 1-6 at 2 ("That would not make sense under Section 8(d)(2), because active voters would be placed on the inactive list, not removed.").

Bucks County also claimed in its March 4, 2020 letter that in 2018 it "marked 188 voters inactive, and cancelled 257 out of county and 1,552 out of state voters due to their relocation out of their voting districts."  (ECF No. 1-5 at 1.)  These three numbers appear in the 2018 state report in a chart entitled "National Change of Address," in Buck's County's data row, under the headings "Marked InActive [sic],"

---

[7]    The State reports define this category, for both active and inactive voter statuses, as "Cancelled because did not respond to mailing after two general federal elections elapsed."  (ECF No. 35-3 at 8) (appears twice).  Note that even as a rough description of the Section 8(d)(2) process this definition is inaccurate, because it implies that the two federal elections *precede* the mailing.  This may be simply an error, but there is no way to be certain without discovery.

"Cancelled Out of County," and "Cancelled Out of State." (ECF No. 35-3 at 33.) As the complaint notes, however, it is unclear whether these categories include cancellations at the movant's written request, which would thus not be cancellations under Section 8(d)(2). (ECF No. 1, ¶ 64.) Further, the complaint cites demographic data regarding the number of moves each year in Bucks County to show that, even if *all* of these cancellations were removals pursuant to Section 8(d)(2), it is simply too few for a county that had 457,235 registered voters in 2019. (*Id*., ¶¶ 42, 65.)

The rest of the data cited in the March 4, 2020 letter concerns statewide removal statistics, which are not relevant to Bucks County's particular situation. (*E.g.*, ECF 1-5 at 2, 3.)[8]

---

[8]    Bucks County also complained in its March 4, 2020 letter (and County Defendants echo in their brief) that Plaintiff's correspondence contained inactive links to the EAC report and census data. (*See* ECF No. 1-2 at 2 n.4 & n.5; ECF No. 1-5 at 3; ECF No. 35-1 at 4.) While this is explained by the fact that the EAC and the Census Bureau were modifying their websites at that time, Bucks County is being disingenuous. The biennial EAC report—for which all Defendants gathered and supplied data—is widely anticipated by county clerks, election officials, and lawyers, and gives rise to much public comment (and NVRA lawsuits). Bucks County's claim to be unable to find it because of a bad link is like an economist pretending not to know where to find a monthly jobs report. In any case, Plaintiff sent Bucks County the full EAC dataset five days later. (*See* ECF No. 1-6 at 1.)
     Bucks County is again being disingenuous when it comes to the census data. *See, e.g.*, ECF No. 1-5 at 3 (complaining, not that a link was inactive, but that website was "soon to be discontinued"). Chester County, by contrast, had no trouble finding the census data. (ECF No. 1-8 at 2.)

Following Plaintiff's March 9, 2020 response letter raising the objections cited above and providing the EAC dataset Bucks County professed itself unable to find, the County replied with a March 20, 2020 letter.  (*See* ECF No. 1-7.) Eschewing any further data analysis, this letter simply promised answers in the future.  Further, Bucks County unilaterally claimed that Plaintiff's March 9, 2020 response letter recommenced the 90-day period for the County to provide answers, presumably a reference to the "cure" period in 52 U.S.C. § 20510(b)(2).  (ECF No. 1-7 at 2.)

Chester County claimed in a December 19, 2019 letter that "in 2017, the County cancelled 8,977 active voter registrations and 12,522 inactive registrations; in 2018, the County cancelled 10,072 active registrations and 2,084 inactive registrations." (ECF No. 1-8 at 1.)  The 2018 numbers are from the same chart relied on by Bucks County, referring to the totals for the row for Chester County.  (ECF No. 35-3 at 37.)  The 2017 numbers come from the same chart in the State report from the previous year.  (ECF No. 35-2 at 35.)

The data cited by Chester County is beset with the same uncertainties, contradictions, and problems affecting the data cited by Bucks County, including that active registrations are irrelevant to Section 8(d)(2) removals; that "VOTER'S REQUEST," "VOTER'S DEATH," and other categories are also irrelevant to such removals; that "VOTER REMOVAL PROGRAM" has an ambiguous meaning

because it appears in both the active and inactive categories; and that the total number of inactive removals is low for a county the size of Chester County.  (*See* ECF No. 1, ¶¶ 70-72.)

Delaware County made no response to Plaintiff's notice letter.

## COUNTY DEFENDANTS' MOTION TO DISMISS

At its core, County Defendants' motion to dismiss relies on three arguments. First, conceding that the data Defendants certified to the EAC was not correct, County Defendants argue that—notwithstanding that this is a motion to dismiss— the Court should deem the data contained in certain charts in the 2017 and 2018 State reports to be the true and accurate data concerning County Defendants' removals under Section 8(d)(2).  They maintain, in effect, that this substitution will allow the Court to dismiss the complaint as not plausible.  (ECF No. 35-1 at 12-14.)

The data County Defendants refer to are, for Bucks, Chester, and Delaware Counties, in 2017: 15,827, 11,647, and 21,134 removed, inactive registrations.  (ECF No. 35-1 at 9, citing ECF No. 35-2 at 35).  These numbers appear in the column headed "VOTER REMOVAL PROGRAM" under the chart for inactives.  The respective numbers on the equivalent chart for 2018 are: 830,[9] 499, and 433 removed, inactive registrations.  (ECF No. 35-1 at 13, citing ECF No. 35-3 at 37).

---

[9]    County Defendants mistakenly cited Butler County's 3,878 removals.

That means that the two-year totals for the three counties are alleged to be: Bucks County, 16,657; Chester County, 12,146; Delaware County, 21,567.[10]

As set forth below, (1) the State reports should not be considered on this motion; (2) even if they were considered, Plaintiff contests the accuracy of the cited data; and (3) even if the data were accurate (which Plaintiff does not concede), Plaintiff contests the import of the cited data.

Second, County Defendants challenge Plaintiff's allegations regarding their high registration rates by claiming not to know where to find census data online, and by raising factual questions of the "have you accounted for X" variety. (ECF No. 35-1 at 15-16.) Neither argument avails on a motion to dismiss.

Third, County Defendants argue that they did not receive notice regarding Plaintiff's Section 8(i) claims. The cases they cite do not support their argument.

## STANDARDS ON A MOTION TO DISMISS

Throughout their motion County Defendants badly misapply the standards governing a motion to dismiss for failure to state a claim. In evaluating a motion to dismiss, "[t]he test, as authoritatively formulated by *Twombly*, is whether the complaint alleges 'enough fact[] to state a claim to relief that is plausible on its

---

[10]   Paradoxically, County Defendants also cite data from the State Defendants' answer to the complaint, which alleges different two-year removal totals. (ECF No. 35-1 at 13 n.11; *see* ECF No. 33-1). Thus, Defendants do not even agree amongst themselves as to the correct number of Section 8(d)(2) removals.

face,'" which is to say, "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of illegal[ity]." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 319 (3d Cir. 2010), quoting, *inter alia*, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556, 570 (2007) (internal quotations omitted).   In other words, a "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).

In making this determination, the Court "must consider only those facts alleged in the complaint and accept all of the allegations as true." *ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 (3d Cir. 1994) (citation omitted); *see Twombly*, 550 U.S. at 589 (Stevens, J., dissenting) (courts must assume that "all the allegations in the complaint are true (even if doubtful in fact)") (citation omitted).   Further, "the Court must also accept as true all reasonable inferences that may be drawn from the allegations, and view those facts and inferences in the light most favorable to the non-moving party." *In re Processed Egg Prods. Antitrust Litig.*, 821 F. Supp. 2d 709, 716 (E.D. Pa. 2011), citing, *inter alia*, *Revell v. Port Auth. of N.Y. & N.J.*, 598 F.3d 128, 134 (3d Cir. 2010).

The Court must not weigh or assess evidence in deciding a motion to dismiss. Indeed, this rule is so fundamental that the Court of Appeals for the Third Circuit characterized the governing law as requiring that "allegations of historical fact …

are assumed to be true even if 'unrealistic or nonsensical,' 'chimerical,' or 'extravagantly fanciful.'" *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 789 (3d Cir. 2016), citing *Iqbal*, 556 U.S. at 681; *see Twombly*, 550 U.S. at 556 ("Rule 12(b)(6) does not countenance … dismissals based on a judge's disbelief of a complaint's factual allegations") (citations and internal quotations omitted); *Schuchardt v. President of the United States*, 839 F.3d 336, 348 (3d Cir. 2016) (rejecting limitations on pleading that "come close to the weighing of evidence and credibility determinations") (citations omitted).

## ARGUMENT

## I. COUNTY DEFENDANTS' FACTUAL DISPUTE ABOUT THE NUMBER OF SECTION 8(d)(2) REMOVALS IS NOT GROUNDS FOR DISMISSING THE COMPLAINT.

### A. THE STATE REPORTS SHOULD NOT BE CONSIDERED IN DETERMINING THIS MOTION.

In considering a pleading's sufficiency, "a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010) (citation omitted). The State reports from 2017 and 2018 fail this test and should not be considered in determining this motion.

First, Plaintiff has no information regarding either the origin or the authenticity of these documents. *See Processed Egg Prods.*, 821 F. Supp. 2d at 740

(documents were not properly before the court in part because "it is unclear whether their authenticity is unchallenged"). Without discovery, Plaintiff has no knowledge of how County Defendants compiled and collected the data underlying these reports. All Defendants now implicitly or explicitly concede that the data originally certified to the EAC was inaccurate. (ECF No. 35-1 at 13 n.11; ECF No. 33, ¶¶ 39-41.) Discovery is necessary to verify the same was not true for these State reports.

Second, and more fundamentally, Plaintiff's "claims are not based upon or integral to these documents." *Id.* "[W]hen courts do look beyond a pleading to entire documents that are merely cited in the complaint," they consider only "documents that are central to the claim at issue, such as contracts for breach of contract claims or public offering documents containing alleged fraudulent statements in securities misrepresentation suits." *Id.* The fact that the *defense* may rely on extraneous documents does not mean that they should be considered. Thus, the court in *Processed Egg Prods.* held that it would not consider documents where the plaintiff did "not rely on the referenced publications," even though "such materials … may well win the day eventually for" the defense. *Id.* at 741.

Here, the State reports are not central to *Plaintiff's* claims.[11] They are not, like the examples given above, the contract in a breach of contract suit, or the public

---

[11]     Of course, Plaintiff did not rely on County Defendants' special summary of the EAC data (ECF No. 35-4). Plaintiff never saw this document prior to this motion.

- 16 -

offering document in a securities fraud suit. *Processed Egg Prods*., 821 F. Supp. 2d at 740. Rather, the State reports *at most* constitute a few pieces of evidence among many, concerning only one issue in the case. Plaintiff did not rely on them, but relied instead on data certified by Defendants to the EAC; on a comparison between Defendants' own registration figures and publicly available census data; and on admitted failures of list maintenance, like those in Allegheny County, among other things. The County Defendants may wish to cite the State reports to try to rebut Plaintiff's conclusions, but that does not make them proper for consideration on this motion to dismiss.

### B.   PLAINTIFF DISPUTES THE ACCURACY OF THE DATA IN THE STATE REPORTS.

Because there are serious doubts about the accuracy of the content of the State reports, they should not form the basis for dismissal. *See Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006) ("before materials outside the record may become the basis for a dismissal … even if a document is 'integral' to the complaint, it must be clear on the record that no dispute exists regarding the authenticity *or accuracy* of the document") (emphasis added, citations omitted). This is only logical, given that all factual inferences on a motion to dismiss are drawn in Plaintiff's favor. *See Revell*, 598 F.3d at 134.

Plaintiff has no idea where Defendants obtained the data contained in the State reports and cannot and will not attest to its accuracy. (Indeed, Defendants do not

agree amongst themselves regarding that data.  *See* note 10, *supra*.)  Further, as

Plaintiff set forth in correspondence attached to the complaint, the meaning of the

category "VOTER REMOVAL PROGRAM" in the State reports is inherently

ambiguous, because the category appears for both active and inactive voters.  (ECF

No. 1-6 at 2.)  *See id*. ("That would not make sense under Section 8(d)(2), because

active voters would be placed on the inactive list, not removed.").

### C.   PLAINTIFF DISPUTES THE *IMPORT* OF THE DATA IN THE STATE REPORTS.

Finally, even if the proffered State reports were integral to the complaint (they

are not) and even if the factual material they contained were undisputed (it most

certainly is not), the complaint should not be dismissed on the basis of that data

because Plaintiff disputes the significance of that data.  *See Faulkner*, 463 F.3d at

134 ("before materials outside the record may become the basis for a dismissal …

[i]t must also be clear that there exist no material disputed issues of fact regarding

the relevance of the document").

The complaint alleges that the EAC report showed that Bucks County had

457,235 total registered voters, Chester County had 357,307 total registered voters,

and Delaware had 403,371 total registered voters.  (ECF No. 1, ¶ 42.)  Dividing the

two-year removal totals asserted by County Defendants (Bucks County, 16,657;

Chester County, 12,146; Delaware County, 21,567) into these total registration

figures, and then dividing *that* figure by two to get the *yearly* average, yields the

following yearly percentage averages for these removals: Bucks County, 1.8%; Chester County, 1.7%; Delaware County, 2.7%.

The complaint alleges that 8.2% of the residents of Bucks County and 14% of the residents of Chester County are living in a different house than they were a year ago.  (ECF No. 1, ¶¶ 65, 71.)  *See also Husted*, 138 S. Ct. at 1838 ("more than 10% of Americans move every year") (citation omitted).  Drawing all reasonable inferences in favor of Plaintiff, the yearly removals of inactive registrants who are likely to have moved are too low.

## II.   COUNTY DEFENDANTS FAIL TO SUCCESSFULLY CHALLENGE PLAINTIFF'S ALLEGATIONS REGARDING THE COUNTIES' HIGH REGISTRATION RATES.

The complaint alleges that Bucks, Chester, and Delaware Counties had registration rates of 96%, 97%, and 97%, and that these rates were high both when compared to other Pennsylvania counties and when compared to the rest of the country.  (ECF No. 1, ¶¶ 51-58.)  Federal courts adjudicating Section 8 claims have acknowledged the significance of high registration rates in stating a claim under Section 8 of the NVRA.  *See Voter Integrity Project NC, Inc. v. Wake Cnty. Bd. of Elections*, 301 F. Supp. 3d 612, 619 (E.D.N.C. 2017) (plaintiff stated a claim under Section 8 by alleging high registration rates when compared to the American Community Survey's citizen voting age population); *see also Am. Civ. Rights Union v. Martinez*, 166 F. Supp. 3d 779, 793-794 (W.D. Tex. 2015) (same).

County Defendants complain that Plaintiff "declines … to tell the Court or the Defendants" what census data is used or "where it may be found." (ECF No. 35-1 at 15.) But the notice letter to each county specifically identified the Census Bureau's American Community Survey (ACS) as the source of the data. (*E.g.*, ECF No. 1-2 at 2 n.4.) County Defendants should have no trouble finding the American Community Survey online. Chester County apparently did. (ECF No. 1-8 at 2.)

Finally, County Defendants raise factual considerations they maintain Plaintiff must account for, *viz.*, whether Plaintiff's calculations considered "the County Defendants' recent population growth" or "include the tens of thousands of inactive voters who cannot be removed from the registration rolls until two federal elections have taken place." (ECF No. 35-1 at 16.) It is obviously out of place in a motion to dismiss to argue or resolve such factual matters.

## III.   PLAINTIFF PROVIDED PROPER NOTICE OF ITS CLAIM UNDER SECTION 8(i).

Each of the notice letters sent to County Defendants informed them of violations of Section 8 of the NVRA, and stated that the letter was "official statutory notice under 52 U.S.C. § 20510(b)(1) & (2) that Judicial Watch will bring a lawsuit against you if these violations are not corrected within 90 days." (*E.g.*, ECF 1-2 at 1.) These same letters requested that the County Defendants provide "certain categories of records to Judicial Watch within two weeks of the date of this letter. If you fail to do so, we will deem it an independent violation of the NVRA." (*Id*. at 3.)

Without citing any authority, County Defendants argue that a proper pre-suit notice "can only be provided after the request has been refused or ignored." (ECF No. 35-1 at 18.)  In other words, according to County Defendants, Plaintiff was required to send a *second* notice letter asserting a violation of the NVRA *after* Defendants were warned that they would be violating the law if they failed to provide the records lawfully requested in the *first* notice letter.  Consider how this approach would affect the timeline for providing documents under Section 8(i).  County Defendants seems to envision that after a request for records is sent, and after a waiting period of unspecified length (or of 90 days?) in which records may be provided, a notice letter must be sent threatening suit if the records are not turned over—within the *next* 90 days.

This argument misreads the plain text and purpose of the NVRA's pre-suit notice requirement.  Section 11 provides in relevant part that any party aggrieved by a violation of the NVRA "may provide written notice of the violation to the chief election official of the State involved."  52 U.S.C. § 20510(b)(1).  Depending on when the violation occurs, the aggrieved party must wait either 20 or 90 days from receipt, or may not need to provide notice at all.  *Id.*, § 20510(b)(2)-(3).  The entire purpose of the NVRA's notice provision "is to allow those violating the NVRA the opportunity to attempt compliance with its mandates before facing litigation." *Georgia State Conf. of the NAACP v. Kemp*, 841 F. Supp. 2d 1320, 1335 (N.D. Ga.

2012) (citation omitted).   Plaintiff provided County Defendants with such an opportunity.

Plaintiff's notice letter provided every opportunity to each Defendant to "attempt compliance with [the NVRA's] mandates before facing litigation," *Kemp*, 841 F. Supp. 2d at 1335, warning Defendants they would be deemed in violation should they fail to comply with Plaintiff's document request.   None of the Defendants provided the requested documents and only Bucks County offered to make them available for public inspection.   County Defendants were well aware of Plaintiff's document request after Plaintiff's first notice letter and did not cure the violation by providing documents within the 90-day window.   In such circumstances, the NVRA does not require Plaintiff to send a second notice of violation letter.   *See Judicial Watch, Inc. v. Lamone*, 399 F. Supp. 3d 425, 440-41 (D. Md. 2019) (rejecting argument that plaintiff failed to provide proper notice for Section 8(i) violations when "Defendants were provided notice that plaintiff seeks information" and failed to provide that information); *see also Ass'n of Cmty. Organizations for Reform Now v. Miller*, 129 F.3d 833, 838 (6th Cir. 1997) (additional notice would be "futile" after defendants received and refused to comply with organization's first notice); *Judicial Watch, Inc. v. King*, 993 F. Supp. 2d 919, 922 (S.D. Ind. 2012) ("duplicative notices from the additional plaintiffs would not have furthered the purpose of the NVRA's notice requirement").

Defendants' precedent misses the mark. *Public Interest Legal Foundation v. Boockvar*, 370 F. Supp. 3d 449 (M.D. Pa. 2019) is inapposite. There, plaintiff "failed to comply with the [NVRA]'s clear directive that a state's chief election official must receive notice of a violation before the aggrieved party may file suit." *Id.* at 457. Instead, plaintiff's notice was directed solely to the county commissioner. *Id.* Not so here. Plaintiff sent its notice of violation to *both* the county and Secretary Boockvar, the chief election official of the Commonwealth.

*Bellitto v. Snipes*, 268 F. Supp. 3d 1328 (S.D. Fla. 2017) and *Kemp*, 841 F. Supp. 2d at 1335 are equally unhelpful. In *Kemp*, the individual plaintiff was not included on the notice letter and the defendants had no actual notice of the violations unique to that individual until suit was filed. *See id.* Importantly, however, the court concluded that the organizational plaintiff who was included on the notice letter, like Plaintiff here, provided sufficient notice to defendants. *Id.* at 1334-35. And in *Bellitto*, plaintiff never notified defendants they would be in violation of the NVRA should they fail to respond to the record request. 268 F. Supp. 3d at 1334-1335. By contrast, Plaintiff here explicitly advised Defendants that if they failed to respond or otherwise indicate a time when records were available, they would be deemed to have violated the NVRA. Plaintiff, therefore, put County Defendants on actual notice that they would be held to account for violating the law if they failed to

produce records.  County Defendants never produced the records.  Plaintiff's pre-suit notice letter for violations of Section 8(i) satisfied the NVRA.

## **CONCLUSION**

For the foregoing reasons, the Court should deny County Defendants' motion to dismiss the claims against them.

August 7, 2020

*/s/ T. Russell Nobile*
T. Russell Nobile*
JUDICIAL WATCH, INC.
Post Office Box 6592
Gulfport, Mississippi 39506
(202) 527-9866
Rnobile@judicialwatch.org

Robert D. Popper*
Eric W. Lee*
JUDICIAL WATCH, INC.
425 Third Street SW, Suite 800
Washington, D.C. 20024
(202) 646-5172
Rpopper@judicialwatch.org
Elee@judicialwatch.org

Shawn M. Rodgers, Esq.
Jonathan S. Goldstein, Esq.**
GOLDSTEIN LAW PARTNERS, LLC
11 Church Road
Hatfield, Pennsylvania 19440
srodgers@goldsteinlp.com
jgoldstein@goldsteinlp.com
(610) 949-0444

H. Christopher Coates*
LAW OFFICE OF H. CHRISTOPHER COATES
934 Compass Point
Charleston, South Carolina 29412

- 24 -

(843) 609-7080
curriecoates@gmail.com

\* *Admitted pro hac vice*
\*\* *Application for admission pro hac vice forthcoming*

## CERTIFICATE OF WORD COUNT

I certify that the above memorandum complies with the Court's Order of
August 5, 2020 (ECF No. 45) granting leave to file a brief with up to 6,000 words,
because it contains <u>5,783</u> words.

August 7, 2020                          */s T. Russell Nobile*
                                        T. Russell Nobile

## CERTIFICATE OF SERVICE

I certify that the foregoing memorandum of law in opposition to County Defendants' motion to dismiss the claims against them was filed electronically and served on counsel of record via the ECF system of the U.S. District Court for the Middle District of Pennsylvania.

August 7, 2020                              */s T. Russell Nobile*
                                            T. Russell Nobile