# IN THE UNITED STATES DISTRICT COURT FOR
## THE MIDDLE DISTRICT OF PENNSYLVANIA
## HARRISBURG DIVISION

|  |  |  |
|---|---|---|
| | : | |
| JUDICIAL WATCH, INC., | : | NO. 1:120-cv-00708 |
| | : | (Judge Christopher C. Conner) |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| COMMONWEALTH of | : | |
| PENNSYLVANIA, et al., | : | |
| | : | |
| Defendants. | : | |

## REPLY BRIEF IN FURTHER SUPPORT OF
## <u>MOTION TO DISMISS OF THE COUNTY DEFENDANTS</u>

# TABLE OF CONTENTS

I.  Argument ................................................................................................2

    A.    The Public Record Regarding the County Defendants' Voter List Maintenance Efforts – Including the Entirety of the EAC Spreadsheet, the Revised EAC Data, and the DOS Annual Report Data – Compels Dismissal of Count I ......................................2

        1.    Judicial Watch's Factual Allegations Are Insufficient to State a Plausible Claim Under Subsection 20507(a)(4) .............6

        2.    Judicial Watch Misinterprets The County Defendants' Obligations Under Subsection 20507(a)(4) and Fails to Articulate A Coherent Legal Theory in Support of Count I ..............................................................................................10

    B.    Count II Must Be Dismissed Because Judicial Watch Did Not Provide Proper Notice of Its Claims Under Subsection 20507(i).......11

II.  Conclusion .................................................................................................14

Judicial Watch's Opposition to the County Defendants'[1] Motion to Dismiss fails to address the central flaws that cripple their attempt to plead claims under the National Voter Registration Act (the "NVRA"). Count I of the Complaint asserts that the County Defendants have failed to "conduct a general program that makes a reasonable effort" to remove from voter rolls those registrants who have become ineligible due to death or change of residence, as required under 52 U.S.C. § 20507(a)(4). Count II asserts that the Chester and Delaware County Defendants (and Secretary Boockvar) violated the NVRA's command under 52 U.S.C. § 20507(i) that states maintain and make available for public inspection certain related records. Both Counts are subject to dismissal for failure to state a claim for which relief can be granted under Federal Rule of Civil Procedure 12(b)(6).

Specifically, Count I fails to state a claim because Judicial Watch does not plead any theory about why the County Defendants' voter list maintenance efforts are unreasonable based on the *actual public records* detailing those efforts.

---

[1] Defendants Bucks County Commission, Bucks County Board of Elections, Bucks County Registration Commission, Thomas Freitag, in his official capacity as Elections Director for Bucks County, Chester County Commission, Chester County Board of Elections, Chester County Registration Commission, Sandra Burke, in her official capacity as Director of Elections in Chester County, Delaware County Council, Delaware County Board of Elections, Delaware County Registration Commission, and Laureen Hagan, in her official capacity as Chief Clerk, Elections Bureau for Delaware County, are referred to herein as the "County Defendants."

Judicial Watch further compounds the problem by pleading an ambiguous theory based on *inaccurate, retracted public records* and confusing, uncontextualized figures about voter registration rates in each of the counties, and misconstruing the legal standard. This is insufficient under applicable pleading standards.

Count II fails to state a claim because Judicial Watch never notified the named Defendants that it considered their responses to its records requests to be inadequate under the NVRA before commencing litigation, as required under 52 U.S.C. § 20510(b). Judicial Watch was under an obligation to provide this notice 90 days prior to filing its lawsuit. But it simply never did, instead moving directly from making its records requests to filing the Complaint. This failure compels dismissal of Count II.

## I.    ARGUMENT

### A.    The Public Record Regarding the County Defendants' Voter List Maintenance Efforts – Including the Entirety of the EAC Spreadsheet, the Revised EAC Data, and the DOS Annual Report Data – Compels Dismissal of Count I

Count I is an attempt to plead that the County Defendants have not made "reasonable efforts" to remove from voter rolls those registrants who have become ineligible due to death or change of residence as required by the NVRA (subsection 20507(a)(4)). The core problem with Count I is that Judicial Watch altogether ignores the public record reflecting the County Defendants' efforts in this regard in its pleadings, specifically:

- The spreadsheet of data published in connection with the Election Assistance Commission's 2018 biennial report to Congress (the "EAC Spreadsheet") demonstrates that the County Defendants sent tens of thousands of notices to voters who they had "an indication" had moved or who had not recently voted between 2016 and 2018, had tens of thousands of "inactive" voter registrations as of November 2018, and removed thousands of ineligible voters from the rolls during the relevant time period. *See* Memorandum of Law in Support of Motion to Dismiss of the County Defendants, ECF 35-1 ("Mem.") at 9; Exhibit 3 to Mem.

- Recently revised data in the EAC Spreadsheet corresponding to "survey question A9e," published pursuant to a July 15, 2020 Errata Note, demonstrates that each of the County Defendants removed thousands of registrants for "Failure to respond to notice sent and failure to vote in two most recent federal elections" during the relevant time period.[2]

- The 2017 and 2018 Pennsylvania Department of State annual reports (the "DOS Reports") demonstrate that the County Defendants have engaged in significant voter list maintenance activity, including removing thousands of inactive registrants on the basis that those voters "did not respond to mailing after two federal elections elapsed," during the relevant time period. *See* Mem. at 12-13; Exhibit 1 to Mem. at 7, 35; Exhibit 2 to Mem. at 8, 37.

---

[2] The July 15, 2020 Errata Note is available at: https://www.eac.gov/sites/default/files/Research/Errata_Note_2018_EAVS_v1_3.pdf; the updated EAC Spreadsheet presenting the revised data is available at https://www.eac.gov/research-and-data/datasets-codebooks-and-surveys, by clicking on "EAVS Datasets Version 1.3 (released July 15, 2020)." The Commonwealth has also informed Judicial Watch that it is relying on inaccurate data – Defendants Kathy Boockvar, Secretary of the Commonwealth of Pennsylvania, and the Commonwealth of Pennsylvania jointly filed an Answer to Judicial Watch's Complaint in which they explained that the Commonwealth initially reported inaccurate data in response to "survey question A9e" and that the Commonwealth has since corrected its responses with the EAC to report much higher numbers of removals for "Failure to respond to notice sent and failure to vote in two most recent federal elections" by each of the three County Defendants. *See* Answer and Affirmative Defenses of Defendants Commonwealth of Pennsylvania and Kathy Boockvar, ECF 33, ¶¶ 39-41.

This Court can and should consider these sources in ruling on the County Defendants' Motion to Dismiss. Courts are not limited to the factual allegations in a complaint in evaluating the sufficiency of pleadings, but also may consider public records, including reports published by an administrative body. As the Third Circuit has explained, "[t]o decide a motion to dismiss, courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record," including "published reports of administrative bodies." *Pension Ben. Guar. Corp. v. White Consol. Industries, Inc.*, 998 F.2d 1192, 1196-97 (3d Cir. 1993). The DOS Reports and the entirety of the EAC Spreadsheet[3]—including the recently revised data responsive to "survey question A9e"[4]—are precisely those types of public records. *See, e.g., Hernandez*

---

[3] The entirety of the EAC Spreadsheet can be considered not only as a matter of public record, but also because this document is "integral to" and "explicitly relied upon in the complaint." *In re Burlington Coat Factory Securities Litigation*, 114 F.3d 1410, 1426 (3d Cir. 1997).

[4] Judicial Watch notes in its Opposition that all Defendants agree that certain of the data originally certified to the EAC was inaccurate, (Memorandum of Law in Opposition to the County Defendants' Motion to Dismiss, ECF 46 ("Opp.") at 1, 13 n10, 16), and it appears to oppose consideration of the revised data (Opp. at 13 n.10, raising questions about the accuracy of the revised data), but does not clarify its position as to whether this Court should consider the revised data in ruling on the Motion to Dismiss, or if it should simply refer to the original, inaccurate data. To the extent Judicial Watch takes the latter position, it simply cannot be permitted to proceed on this faulty premise. This Court should not permit Judicial Watch's case to move forward based on officially retracted data, particularly where Judicial

*v. Kiak*, No. 3:14-2317, 2016 WL 5796895, *2 n.3 (M.D. Pa. Sept. 30, 2016)

(holding that Pennsylvania Board of Probation and Parole's directive regarding

registration of sexual offenders could be considered in ruling on a 12(b)(6) motion

as a published report of an administrative body); *Warren v. Matthey*, No. 15-

01919, 2016 WL 215232, *5 (E.D. Pa. Jan. 19, 2016) (holding that reports

prepared by Pennsylvania Department of Environmental Protection could be

considered in ruling on a 12(b)(6) motion as published reports of an administrative

body).

The Complaint avoids these records altogether. Instead, Judicial Watch

relies on inaccurate and ambiguous factual allegations that cannot sustain a claim

on a motion to dismiss. *Finkelman v. National Football League*, 810 F.3d 187,

202 (3d Cir. 2016) (explaining that courts "even at the pleading stage, '[] need not

accept as true unsupported conclusions and unwarranted inferences," and

dismissing complaint that was based on nothing more than "'bald assertion[s]'

unsupported by well-pleaded facts."). Specifically, the principal factual allegations

set forth in the Complaint are the following:

- The originally reported and since retracted, inaccurate EAC Spreadsheet "survey question A9e" data. Complaint, ¶¶ 35-42.

---

Watch consistently rejects other sources of directly relevant data that the
Defendants have presented it with.

- Uncontextualized, meaningless allegations about the voter registration rates in each county, alleged without clarification about what data Judicial Watch used to calculate those rates (that is, whether Judicial Watch considered population data consisting of a multi-year average and what year(s) and geographic region it considered data from, and whether it included active voters as well as inactive voters in the registration numbers it used for its numerators). Complaint, ¶¶ 51-58.

*See also* Opp. at 5-7. These factual allegations cannot support Count I. Moreover, Judicial Watch's incorrect interpretation of subsection 20507(a)(4) further undermines the sufficiency of its pleadings.

### 1. Judicial Watch's Factual Allegations Are Insufficient to State a Plausible Claim Under Subsection 20507(a)(4)

In the principal Memorandum in Support of the Motion to Dismiss the County Defendants established that the since-retracted EAC Spreadsheet data concerning the number of registrants removed for "Failure to respond to notice sent and failure to vote in two most recent federal elections" (the "survey question A9e" data), that was initially reported by the Commonwealth to the EAC, was inaccurate. Mem. at 5 n.4, 13 n.11. The since-retracted data indicated that Bucks, Chester, and Delaware Counties removed eight, five, and four registrants, respectively, on this basis during the relevant time period. The Commonwealth had supplied that inaccurate information to the EAC, (Mem. at 8, Complaint ¶¶ 39-41), and recognizing the mistake, corrected those numbers; consequently the official EAC Spreadsheet now reports 15,714 such removals by Bucks County,

11,519 by Chester County, and 20,968 by Delaware County. *See supra* n.2. Judicial Watch, for some inexplicable reason, continues to argue that it can maintain its Complaint on the erroneous, retracted "survey question A9e" data. That makes no sense.

Compounding this deficiency, Judicial Watch now urges the Court not even to consider the other major public record on this subject – the DOS Reports – in ruling on the Motion to Dismiss.[5]  Opp. at 15-18.  This also makes no sense.  As detailed in the principal Memorandum in Support of the Motion to Dismiss, the DOS Reports indicate that in calendar year 2017, Bucks, Chester, and Delaware Counties cancelled 15,827, 11,647, and 21,134 inactive registrations, respectively, on the basis that they "did not respond to mailing after two federal elections

---

[5] Judicial Watch seems to want to have it both ways, strongly urging the Court not to consider the DOS Reports, but arguing that if it does, they actually support its claims, because Judicial Watch's own manipulation of the data yields average annual removals on the basis that the registrant "did not respond to mailing after two federal elections elapsed" by each County Defendant that are "too low." Opp. at 19.  (Though Judicial Watch does not identify which category of removals it is referring to, the numbers make this clear. *See* Mem. at 12-13; Ex. 1 to Mem. at 7, 35; Ex. 2 to Mem. at 8, 37.)  Even putting aside the faulty premises of Judicial Watch's data manipulation – for example, federal elections trigger this type of removal such that the bulk of them occur in odd-numbered years (Mem. at 13 n.9), rendering multi-year averages meaningless in this context; Judicial Watch's calculations fail to account for the distinction between active and inactive registered voters – Judicial Watch's argument is unpersuasive as it never identifies what level of removals is considered "reasonable" under its interpretation of the law, and why the County Defendants have therefore fallen short.

elapsed," (Ex. 1 to Mem. at 7, 35), and that in calendar year 2018, these numbers were 830,[6] 499, and 433, respectively, (Ex. 2 to Mem. at 8, 37).  *See* Mem. at 12-13.  Once again, this information is properly before this Court in evaluating the sufficiency of the allegations in support of Count I, as is the EAC Spreadsheet data beyond the (incorrect) "survey question A9e" data, which Judicial Watch utterly fails to address in its Complaint or its Opposition.  *Group Against Smog and Pollution, Inc. v. Shenango Inc.*, 810 F.3d 116, 127 (3d Cir. 2016) ("[I]t is the usual practice for a court to consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record.") (internal citation omitted); *Beverly Enterprises, Inc. v. Trump*, 182 F.3d 183, 190 n.3 (3d Cir. 1999) ("It is well-settled that in deciding a motion to dismiss, courts generally may consider only the allegations contained in the complaint, exhibits attached thereto, and matters of public record.") (internal citation omitted).

But that is not the end of the flaws with Judicial Watch's factual allegations; not only is the public record ignored, the Complaint instead offers ambiguous, uncontextualized factual allegations about the County Defendants' voter registration rates, based on its own analysis of "best available census data."

---

[6] County Defendants mistakenly referred to Butler County's 3,878 removals in the principal Memorandum in Support of the Motion to Dismiss.

Complaint ¶¶ 51-58. As explained in County Defendants' principal memorandum, Judicial Watch's figures are completely devoid of the context necessary to understand them. Mem. at 15-16. The whole of Judicial Watch's response on this issue was to unhelpfully assert that it relied upon the Census Bureau's American Community Survey in arriving at these figures (Opp. at 20), as Judicial Watch refused yet again to provide the detail necessary to evaluate the significance of its figures. These allegations cannot carry Count I.

The DOS Reports and EAC Spreadsheet (including the revised "survey question A9e" data) are properly before the Court in evaluating the Motion to Dismiss, and must be addressed because they reflect a robust voter list maintenance program being conducted by the County Defendants. The County Defendants are not asking this Court to rule as a matter of law at this stage that they have fulfilled their obligations under subsection 20507(a)(4). Rather, they are asking the Court to dismiss Count I without prejudice and with the opportunity to replead clear, unambiguous factual allegations based on the actual public record that will adequately inform the County Defendants in what way exactly Judicial Watch alleges they have not made "reasonable efforts" to remove from the voter rolls those registrants who have become ineligible due to death or change of residence.

### 2. Judicial Watch Misinterprets The County Defendants' Obligations Under Subsection 20507(a)(4) and Fails to Articulate A Coherent Legal Theory in Support of Count I

Count I further fails because it is dependent on a flawed interpretation of the NVRA as mandating that the County Defendants use the procedure set forth in subsection 20507(d)(2) to remove voters on the basis of change of residence. Subsection 20507(d)(2) does not, as Judicial Watch argues, "establish[] that the procedure it describes *must* be used in order to cancel the registrations of those who have moved."  Opp. at 4.  Rather, the text of the NVRA, and the Supreme Court's interpretation thereof, provides two different procedural mechanisms for removals based on change of residence.  52 U.S.C. § 20507(d)(1)(A)-(B); *see Husted v. A. Phillip Randolph Institute*, 138 S. Ct. 1833, 1839 (2018) ("[T]he NVRA is clear about the need to send a 'return card' (*or* obtain written confirmation of a move) before pruning a registrant's name…") (emphasis added) (citing § 20507(d)(1)).[7]  The NVRA requires states to remove voters on the basis

---

[7] Oddly, in the same breath that it asserts that the NVRA requires use of the procedure set forth in subsection 20507(d)(2), Judicial Watch concedes that the Supreme Court has recognized that "'*if the State does not send*' such a notice 'or otherwise get written notice that the person has moved, *it may not remove* a registrant on change-of-residence grounds'" – that is, that County Defendants have *two procedural options* for removing voters on the basis of change of residence.  Opp. at 4 (quoting *Husted*, 138 S. Ct. at 1839) (emphasis added in Opp.) (internal modifications omitted).  The County Defendants clearly explained this statutory construction in the principal Memorandum in Support of the Motion to Dismiss,

of change of residence, but it does *not require* them to do so by using *both* procedures.  Consequently, Count I is based on an incorrect interpretation of the statute.

**B.** **Count II Must Be Dismissed Because Judicial Watch Did Not Provide Proper Notice of Its Claims Under Subsection 20507(i)**

In Count II Judicial Watch claims that the Chester and Delaware County Defendants and Secretary Boockvar failed to fulfill their obligations under the NVRA to make certain records available for public inspection.[8]  But it is Judicial Watch that failed to comply with the statutory requirement to notify the Defendants of these alleged NVRA violations prior to filing suit.  52 U.S.C. 20510(b).  Judicial Watch asked Chester and Delaware Counties to provide several categories of records under subsection 20507(i) in its single correspondence to them on December 11, 2019, and stated that it would deem the failure to do so "an independent violation of the NVRA."  Exhibits 2 and 3 to the Complaint, p. 3.  But it *never followed up* with either county to notify them that it deemed their responses to those requests inadequate.  It is this notice that triggers Judicial

---

(Mem. at 11-12), but Judicial Watch did not offer any explanation in its Opposition for its twisted interpretation of the statute and relevant precedent.

[8] The Bucks County Defendants are not named in Count II.

Watch's ability to file a lawsuit under the NVRA, and its failure to provide this notice is fatal to these claims.

Judicial Watch's Opposition obscures the requirements of subsection 20510(b) in connection with claims under subsection 20507(i). Opp. at 21. In fact, the applicable rules are straightforward:

- Subsection 20507(i) requires states to "maintain…and [] make available for public inspection" all records reflecting voter list maintenance activities.

- Subsection 20510(b) imposes a two-step process for bringing an NVRA claim: 1) an aggrieved party must first "provide written notice of the violation"; 2) "[i]f the violation is not corrected within 90 days," litigation may be commenced.[9]

Prior to bringing a claim under subsection 20507(i), then, a potential plaintiff must first provide written notice to a potential defendant that it has determined its response to a records request is inadequate under the statute. Here, Judicial Watch skipped this first step, and thus deprived the Count II Defendants of the opportunity to correct the issue without facing litigation.

Judicial Watch attempts to distinguish the most directly on-point precedent, *Bellitto v. Snipes*, 268 F.Supp.3d 1328 (S.D. Fla. 2017), which involved dismissal

_____

[9] Depending on the timing of the next upcoming federal election, the length of the curative period differs. The undisputed, relevant curative period in this case is 90 days.

of a subsection 20507(i) claim for lack of pre-suit notice, by arguing that the

*Bellitto* "plaintiff never notified defendants they would be in violation of the

NVRA should they fail to respond to the record request," while Judicial Watch

"explicitly advised Defendants" of this fact. Opp. at 23. But the determinative

factor in *Bellitto* was not plaintiff's failure to notify the defendant that an

inadequate response *would* constitute an NVRA violation; rather, it was the *Bellitto*

plaintiff's failure to notify the defendant that its inadequate response *did* constitute

an NVRA violation that doomed its claim, and that failure is what dooms Count II

here.[10] As this Court has explained, "[NVRA pre-suit] notice [is] sufficient when

it [] sets forth the reasons that a defendant purportedly *failed* to comply with the

NVRA," *Public Interest Legal Foundation v. Boockvar*, 370 F.Supp.3d 449, 456-

57 (M.D. Pa. 2019), that is, when it details an NVRA violation that *has already*

---

[10] The court in *Bellitto* explained "[t]he point is neatly illustrated by *Project Vote, Inc. v. Kemp*, 208 F.Supp.3d 1320 (N.D. Ga. 2016)," where sufficient pre-suit notice of a subsection 20507(i) claim was found. "Importantly, [in *Kemp*], the plaintiff's request and the defendant's response *preceded* the notice letter that plaintiff sent the defendant," and "the notice letter 'described the records Plaintiff requested…*and sought to explain why Defendant's productions failed to satisfy those requests.*'" *Bellitto*, 268 F.Supp.3d at 1335 (quoting *Kemp*, 208 F.Supp.3d at 1347-48) (emphasis added by *Bellitto* court). By contrast, in *Bellitto,* "there was never any request for records by [plaintiff]…prior to [plaintiff's] notice letter." *Bellitto*, 268 F.Supp.3d at 1335. Judicial Watch's pre-suit correspondence with the Count II Defendants suffers from the very same defect.

*occurred*.  Notice of a potential future violation – like the notice Judicial Watch

provided here – is insufficient.

Clearly it is Judicial Watch, not the County Defendants, who "misreads the

plain text and purpose of the NVRA's pre-suit notice requirement."  Opp. at 21.

This procedure is designed to "provide states an opportunity to attempt compliance

before facing litigation," *Boockvar*, 370 F.Supp.3d at 457 (internal quotation,

citation, and modification omitted).  Had Judicial Watch followed the procedures

required by the statute, its basic misunderstandings of fundamental facts could

have been clarified, and the Count II Defendants could have attempted to provide

further responses that Judicial Watch would have deemed satisfactory, thereby

perhaps avoiding the need for this litigation altogether.[11]

## II.     CONCLUSION

Count I is based on inaccurate, ambiguous factual allegations and a faulty

statutory interpretation that cannot sustain its claims under subsection 20507(a)(4).

Count II fails because Judicial Watch did not provide the statutorily required pre-

_____

[11] Perhaps Judicial Watch's statement that its pleadings consist of "specific, nonconclusory allegations that may be tested in discovery and at trial," (Opp. at 7), is a clue to what is really going on: from Judicial Watch's perspective, whether or not the Complaint has adequate allegations and whether or not Judicial Watch provided adequate notice under the statute is incidental to its desire to engage in protracted, burdensome, and unnecessary discovery against the County Defendants and other government officials.

suit notice.  The County Defendants therefore respectfully ask the Court to dismiss

all claims asserted against them in the Complaint pursuant to Fed. R. Civ. P.

12(b)(6).

Respectfully submitted,

HANGLEY ARONCHICK SEGAL
PUDLIN & SCHILLER

By:  /s/ Mark A. Aronchick
      Mark A. Aronchick
      Michele D. Hangley
      Christina C. Matthias*
      One Logan Square, 27th Floor
      Philadelphia, PA  19103
      Telephone: (215) 496-7050
      Email: maronchick@hangley.com

*Counsel for County Defendants*

*\*Admitted pro hac vice*

Date: September 4, 2020

## CERTIFICATE OF SERVICE

I, Mark A. Aronchick, certify that on September 4, 2020, I caused a true and correct copy of the foregoing Reply Brief in Further Support of Motion to Dismiss of the County Defendants to be electronically filed and served with the Court using the Electronic Case Filing System.

*/s/ Mark A. Aronchick*
Mark A. Aronchick

# Unpublished Opinions

2016 WL 5796895
Only the Westlaw citation is currently available.
United States District Court, M.D. Pennsylvania.

Deriel HERNANDEZ, Plaintiff

v.

Mark KIAK,[1] et al., Defendants.

CIVIL ACTION NO. 3:14-CV-2317
|
Signed 09/30/2016

**Attorneys and Law Firms**

Deriel Hernandez, Waymart, PA, pro se.

Sean P. McDonough, Dougherty, Leventhal & Price, L.L.P., Moosic, PA, Kenneth L. Joel, Lucy E. Fritz, Office of the Attorney General, Harrisburg, PA, for Defendants.

**MEMORANDUM**

William J. Nealon, United States District Judge

**I. Background**

**\*1** On December 5, 2014, Plaintiff, Deriel Hernandez, an inmate currently confined at the State Correctional Institution, Waymart, Pennsylvania ("SCI-Waymart"), instituted the above-captioned action by filing a pro se complaint pursuant to 42 U.S.C. § 1983. See (Doc. 1). He names the following as Defendants: Mark Kijek; Samual Granteed; Michael Vecchio; Luzerne County Adult Probation and Parole (collectively "Probation Defendants"); Luzerne County District Attorney Stephanie Salavantis; Pennsylvania State Police ("PSP"); Luzerne County Council ("LCC"); and Tim McGinley. (Id.).

On February 10, 2015, Defendants filed separate motions to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (Docs. 21-24). On February 24, 2015, Defendants filed separate briefs in support of their motions. (Docs. 25-28). On April 17, 2015, Plaintiff filed his brief in opposition. (Doc. 45).

By Memorandum and Order dated September 30, 2015, Defendants' motions to dismiss were granted and Plaintiff was given an opportunity to file an amended complaint. (Docs. 49, 50).

On October 16, 2015, Plaintiff filed an amended complaint, in which he names the following Defendants: Mark Kijek; Samual Granteed; Michael Vecchio; Luzerne County Adult Probation and Parole (collectively "Probation Defendants"); Current Commissioner of Pennsylvania State Police; Supervisor of Pennsylvania State Police Megan's Law Unit; "Jane Doe of Pennsylvania State Police Megan's Law Unit, who on or about 8, September, 2014, spoke with Towanda Stalling of SCI-Camp Hill and entered or caused to enter Plaintiff information on to the PSP-Megan's Law Website"; (collectively "PSP Defendants"). (Doc. 53, Amended Complaint).

Presently before the Court are Defendants' motions to dismiss Plaintiff's Amended Complaint. (Docs. 56, 57). The motions have been fully briefed, and are ripe for disposition. For the reasons set forth below, the Court will grant Defendants' motions to dismiss.

**II. Motion to Dismiss**

"The court tests the sufficiency of the complaint's allegations when considering a Rule 12(b)(6) motion." Kapish v. Advanced Code Group, 2015 U.S. Dist. LEXIS 115940, at *5-6 (M.D. Pa. Sept. 1, 2015) (Munley, J.). "In considering a motion to dismiss pursuant to Rule 12(b)(6), courts 'accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief.' " Roth v. Cabot Oil & Gas Corp., 919 F. Supp. 2d 476, 481 (M.D. Pa. 2013) (Jones, J.) (quoting Phillips v. Cnty. of Allegheny, 515 F.3d 224, 231 (3d Cir. 2008)). However, "the tenet that a court must accept as true all of the [factual] allegations contained in the complaint is inapplicable to legal conclusions." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal citations omitted). "In ruling on such a motion, the Court primarily considers the allegations of the pleading, but not required to consider legal conclusions alleged in the complaint." Bryan v. Kings Express, Inc., 2015 U.S. Dist. LEXIS 97179, at *2-3 (M.D. Pa. July 27, 2015) (Brann, J.) (citing Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir. 1993)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678. "At the motion to dismiss stage, the Court considers whether Plaintiff is entitled to offer evidence to support the allegations in the complaint." Bryan, 2015 U.S. Dist. LEXIS 97179, at *3 (citing Maio v. Aetna, Inc., 221 F.3d 472, 482 (3d Cir. 2000)).

**\*2** "In considering a Rule 12(b)(6) motion, we must be mindful that federal courts require notice pleading, as opposed to the heightened standard of fact pleading." Hellman v. Kercher, 2008 U.S. Dist. LEXIS 54882, at \*4 (W.D. Pa. 2008). Rule 8(a)(2) " 'requires only a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds on which it rests.' " Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)). "However, even under this lower notice pleading standard, a plaintiff must do more than recite the elements of a cause of action, and then make a blanket assertion of an entitlement to relief under it." Bryan, 2015 U.S. Dist. LEXIS 97179, at \*4 (citing Hellman, 2008 U.S. Dist. LEXIS 54882). "Instead, a plaintiff must make a factual showing of his entitlement to relief by alleging sufficient facts that, when taken as true, suggest the required elements of a particular legal theory." Id. (citing Twombly, 550 U.S. at 556).

Generally, in resolving a Rule 12(b)(6) motion to dismiss, a court should consider only the allegations in the complaint, as well as "documents that are attached or submitted with the complaint, ... and any matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, [and] items appearing in the record of the case." Buck v. Hampton Twp. Sch. Dist., 452 F.3d 256, 260 (3d Cir. 2006). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not 'shown'–'that the pleader is entitled to relief.' " Iqbal, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

"The failure-to-state-a-claim standard of Rule 12(b)(6) 'streamlines litigation by dispensing with needless discovery and factfinding.' " Bryan, 2015 U.S. Dist. LEXIS 97179, at \*4 (quoting Neitzke v. Williams, 490 U.S. 319, 326-27 (1989)). "If it is beyond a doubt that the non-moving party can prove no set of facts in support of its allegations, then a claim must be dismissed 'without regard to whether it is based on an outlandish legal theory or on a close but ultimately unavailing one.' " Id.

## III. STATEMENT OF FACTS

Plaintiff was charged with indecent assault-without consent of other pursuant to 18 Pa.C.S. § 3126(a)(1), indecent assault-person unconscious pursuant to 18 Pa.C.S. § 3126(a)(4), and corruption of minors pursuant to 18 Pa.C.S. § 6301(a) (1). Commonwealth v. Hernandez, CP-40-CR-169-2006

(Luzerne Cnty. Mar. 3, 2006).[2] While Plaintiff's indecent assault charge filed under 18 Pa.C.S. § 3126(a)(4) was eventually dismissed, the remaining charges were held over for court. Id. On June 13, 2006, Plaintiff entered into a plea agreement in which he pled guilty to those remaining charges. Id.

On March 1, 2010, Plaintiff was sentenced to twelve (12) months to two (2) years on the charge of indecent assault, which in Pennsylvania is classified as an M2 offense, and four (4) to eight (8) months on the charge of corruption of minors, which in Pennsylvania is classified as an M1 offense. Id.

The Commonwealth of Pennsylvania, Department of Probation and Parole in conjunction with the Pennsylvania State Police issued to all county probation departments a chart classifying various sexual offenses for purposes of determining the registration requirements under the Adam Walsh Act (Section 9799.33 of Title 42, Registration of Sexual Offenders (commonly known as "Megan's Law" as amended Act 111 of 2011 and Act 75 of 2012)(now known as the Adam Walsh Act)).[3] The Adam Walsh Quick Reference Guide classifies Hernandez's guilty plea on the charge of indecent assault without the victim's consent as a Tier 1 offense and Hernandez's guilty plea to the charge of corruption of minors as a Tier I offense. (See Doc. 58-1 at 15, Adam Walsh Crimes Quick Reference Guide).

**\*3** On November 16, 2012, Pennsylvania Board of Probation and Parole issued its decision letter and directive in which it explained that registration of a sexual offender for Tier 1 offenses such as Hernandez was for a period of 15 years. (Doc. 58-1 at 18, position paper and accompanying documents issued by the Commonwealth of Pennsylvania, Pennsylvania Board of Probation and Parole explaining the registration requirements for the Adam Walsh Act). The documents of record and those documents of which the Court is permitted to take judicial notice establish that by virtue of his guilty pleas entered on June 13, 2006, Hernandez was subject to the registration requirements of the Adam Walsh Act. Plaintiff's criminal docket establishes that he was under the supervision of the Luzerne County Adult Probation Office at the time of the issuance of the Commonwealth of Pennsylvania's directive relative to sexual offender registration. The Pennsylvania Board of Probation and Parole directive to county probation officers required Luzerne County to take the steps alleged by Plaintiff in his Amended Complaint. Specifically that:

If an offender convicted of one of the listed crimes that did not previously require registration is currently under county or state probation or parole supervision on December 20, 2012, the supervising probation or parole office is required to collect registration information required under § 9799.16(b) and (c) from the offender and enter the registration information on the offender on the Pennsylvania State Police's SORT application within 48 hours. If the offender refuses to comply the supervising probation or parole office shall notify the Pennsylvania State Police. 42 Pa.C.S. § 9799.19(e.2). This same procedure and time period applies to offenders being supervised in Pennsylvania by a county or state probation or parole office under the Interstate Compact for Adult Offender Supervision, 42 Pa.C.S. § 9799.19(f)(2).

(See Doc. 58-1 at 19).

On October 16, 2015, Plaintiff filed his Amended Complaint in which he alleges that he does not meet the registration requirements pursuant to the Sexual Offender Registration and Notification Act ("SORNA"), which was enacted on December 20, 2011, and went into effect on December 20, 2012. (Doc. 53, Amended Complaint).

Specifically, he claims that Defendants Kijek, Vecchio and Luzerne County Adult Probation "erred when registering Plaintiff on Megan's Law". Id. Plaintiff further contends that Defendant Kijek "entered or caused to enter Plaintiff's photo and private information on the PSP-Megan's Law Website on January 24, 2013". Id. Plaintiff alleges that Defendant Vecchio, as Chief Probation Officer, gave the directive to "register Plaintiff as a violant [sic] sex officer". Id. He further contends that the LCAPP was "negligent in the training of their officers and failed to create and enforce standards that would protect probationers from violations. Id. He believes that he "has been erroneously labeled and published as a violent sex offender ... as a result of this negligence". Id.

Plaintiff alleges that the Luzerne County Adult Probation Defendants "erred when they prosecuted Plaintiff for violations of probation" and that this act was a violation of contractual law and his civil rights. Id. He claims that he was charged with "failure to update address and failure to make payment of restitution", and further alleges that the Luzerne County Adult Probation Defendants "conspired to misuse court proceedings in order to maintain jurisdiction and supervision of Plaintiff while Plaintiff was under investigation for an alleged complaint discovered in a PFA suit. Id.

Plaintiff alleges that Defendant Granteed pleaded to the Court that the Plaintiff "being a registered sex offender and should be confined as a result of not updating his address". Id. Plaintiff contends that he was "erroneously registered on the PSP – Megan's Website earlier in the year by Defendants Kijek, Vecchio and LCAPP". Id.

Plaintiff contends that these actions "ultimately voided plaintiff's original plea agreement ... and resulted in the resentencing and order to register as a sex offender by the court". Id. Plaintiff alleges that Defendant Vecchio had "direct involvement in these proceedings ... as he was the authorized party of the filing of said probation violation". Id.

**\*4** Finally, he claims that the plea agreement which he entered into in 2006 is "to be construed under contractual law", and that the Probation Defendants breached this agreement on January 24, 2013. Id.

With respect to the PSP Defendants, Plaintiff alleges that on September 8, 2014, PSP's Supervisor in charge of the Megan's Law Unit was informed that Plaintiff was not required to register pursuant to SORNA. Id. The PSP Supervisor was allegedly contacted by a Ms. Towanda Stallings, an employee of the Department of Corrections. Id. Plaintiff also claims that his spouse mailed a copy of an August 7, 2014 court order of Judge Barrasse of the Lackawanna County Court of Common Pleas, but does not specify who this court order was mailed to or where it was sent. Id. Hernandez further alleges that the PSP Commissioner was negligent in the training of officers, and that "Defendants" have failed to comply with standing policy. Id.

As such, Plaintiff purportedly asserts the following claims against the PSP Defendants: violation of privacy pursuant to the First Amendment; violation of privacy pursuant to Article I, Section 17 of the Pennsylvania Constitution; cruel and unusual punishment pursuant to the Eighth Amendment; cruel and unusual punishment pursuant to Article I, Section 13 of the Pennsylvania Constitution; and state law tort claims of libel, defamation and negligence. Id.

## IV. DISCUSSION

### A. Probation Defendants
The Probation Defendants assert that:

[t]he only actual fact in the Complaint to which [Plaintiff] has pointed in alleging liability against the Probation Defendants is his claim that Defendant Kijek registered [Plaintiff] as a sex offender which led to the publication of his photograph on a State Police Website.

(Doc. 58, at 18). According to the Probation Defendants, "[t]he registration about which [Plaintiff] complains is mandated by Pennsylvania law." Id. Further, the Probation Defendants argue that compared to the circumstances in Giove v. Holden,[4] "[t]he instant case represents an even more favorable factual predicate to defendants as [Plaintiff] has failed to allege any error on defendants' part." Id. The Court agrees.

Section 9799.39 of the Adam Walsh Act, 42 Pa. C.S.§ 9799.33 governs registration particulars and provides:

§ 9799.39 Photographs and fingerprinting

An individual subject to registration shall submit to fingerprinting and photographing as required by this subchapter. Fingerprinting as required by this subchapter shall, at a minimum, require submission of a full set of fingerprints and palm prints. Photographing as required by this subchapter shall, at a minimum, require submission to photographs of the face and any scars, marks, tattoos or other unique features of the individual. Fingerprints and photographs obtained under this subchapter may be maintained for use under this subchapter and for general law enforcement purposes.

Moreover, the Court finds the facts of the instant case nearly identical to the facts in the case of Giove. In Giove, the plaintiff contended that his identify and photograph were erroneously displayed on a local law enforcement registry accessible to the public. The Giove Court undertook an analysis of both the constitutional claim asserted by the plaintiff as well as plaintiff's state law defamation claim and held that dismissal of the complaint was appropriate.

**\*5** As stated by the Giove Court:

It is well established in this court that a cause of action brought under 42 U.S.C. § 1983 requires a plaintiff to plead that each constitutional official, through the official's own individual actions, has violated the Constitution. Rahim v. Holden, 831 F.Supp.2d 845, 848-49 (D. Del. 2011).

\* \* \* \*

The second amended complaint sets forth plaintiff's due process and privacy claims in the context of the SOR Law. (D.I. 28 at ¶¶ 28-32) However, § 1983 only supports causes of action based on a violation of federal statutory law or constitutional rights, not violations of state statutes. Benn v. Universal Health Sys., Inc., 371 F.3d 165, 174 (3d Cir. 2004) ("Section 1983 does not provide a cause of action for violations of state statutes."); see also Paul v. Davis, 424 U.S. 693, 711-12 (1976) (holding that an interest in reputation covered by state tort law was neither "liberty" nor "property" under due process inquiry, even when alleged injury was inflicted by a state officer). Because the crux of the due process claims in the second amended complaint is the allegedly erroneous publication of plaintiff's conviction in violation of the SOR Law, plaintiff's constitutional due process and privacy claims fail.

Giove, supra (slip op. at p. 6).

Thus, Plaintiff has failed to state a plausible due process or right to privacy[5] claim in his amended complaint. This Court need not give him yet another opportunity to amend his Complaint to state such claims.

Likewise, Plaintiff's new constitutional claims raised in his Amended Complaint, are also without merit.

Hernandez argues a violation of Article I, Section 10, Clause 1 of the U.S. Constitution, the constitutional provision which was enacted to prohibit the individual states from entering treaties with foreign governmental and establishing their own currency. The provision provides as follows:

Section 10. No State shall enter into any Treaty, Alliance, or Confederation; grant Letters of Marque and Reprisal; coin Money; emit Bills of Credit; make any Thing but gold and silver Coin a Tender in Payment of Debts; pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts, or grant any Title of Nobility.

Clearly, this provision has no application to Hernandez's circumstances.

With respect to Plaintiff's right to property claim under the Fifth Amendment, Plaintiff fails to establish a double jeopardy, self incrimination, or takings claim, which are the components of the Fifth Amendment, made applicable to the states through the Fourteenth Amendment. The Due Process

clause of the Fifth Amendment does not directly apply to actions of state officials. Knoetze v. U.S., 634 F. 2d 207, 211 (5 Cir.), cert. denied, 454 U.S. 823 (1981); Huffaker v. Bucks County Dist. Attorney's Office, 758 F. Supp. 287, 290 (E.D. Pa. 1991); Popow v. City of Margate, 476 F. Supp. 1237 (D.N.J. 1979). Thus, Hernandez's Fifth Amendment claims against the Probation Defendants is to be dismissed.

**\*6** As for the Fifth Amendment claims against the Luzerne County Probation Defendants, Hernandez does not meet the heightened specificity requirements necessary to sufficient plead a civil rights violation. He does specifically claim that the Defendants destroyed his reputation and sense of security by registering him as a sex offender. However, the Supreme Court and numerous decisions from our Court of Appeals, have held that there is no cognizable § 1983 action for injuries to reputation caused by public knowledge of a criminal investigation or prosecution. Paul v. Davis, 424 U.S. 693, 701-712 (1976) (holding reputation not protected by the Due Process Clause of the Fifth Amendment, and therefore, only actionable under § 1983 if accompanied by the loss of a guaranteed federal or state right). See, e.g., Clark v. Township of Falls, 890 F.2d 611, 619-620 (3dCir. 1987) (applying principle that harm to reputation does not constitute a loss of guaranteed federal or state right); Sturm v. Clark, 835 F.2d 1009 (3d Cir. 1987) (holding loss of future employment is not actionable under § 1983, because not federally guaranteed right); Lahanza v. Azeff, 790 F. Supp. 88, 93 (E.D. Pa 1992) (holding damage to reputation from criminal prosecution not actionable under § 1983). Consequently, Hernandez fails to raise a valid Fifth Amendment property rights claim, and the Probation Defendants are entitled to dismissal.

Finally, with respect to Plaintiff's claim under Article I, Section 13 of the Pennsylvania Constitution, it is well-settled that there is no private right of action for monetary damages under the Pennsylvania Constitution. Jones v. City of Philadelphia, 890 A.2d 1188 (Pa. Cmwlth. Ct. 2006), appeal den'd, 589 Pa. 741 (2006). Accordingly, the Probation Defendants motion to dismiss will be granted.

### B. Defendant PSP

The PSP Defendants argue that their motion to dismiss should be granted because Plaintiff's section 1983 claims are barred by the Eleventh Amendment to the United States Constitution. Specifically, in his Amended Complaint, Plaintiff specifies that "[a]ll defendants are sued individually and in their official capacity." (Doc. 53 at 1). Plaintiff's § 1983 claims against the PSP Defendants in their official capacity

are barred by the Eleventh Amendment to the United States Constitution. That amendment provides:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. Amend. XI.

The Eleventh Amendment has been interpreted "to stand not so much for what it says, but for the presupposition ... which it confirms." Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 54 (1996) (quoting Blatchford v. Native Village of Noatak, 501 U.S. 775, 779 (1991)). That presupposition is that each state is a sovereign entity in our federal system and that it is inherent in the nature of sovereignty that a sovereign is not amenable to suit unless it consents. Id. Thus, "the Constitution does not provide for federal jurisdiction over suits against nonconsenting States." Kimel v. Florida Bd. of Regents, 528 U.S. 62, 73 (2000).

Accordingly, absent express consent by the state in question or a clear and unequivocal waiver by Congress, states are immune from suit in federal court. See Seminole Tribe, 517 U.S. at 54. Moreover, "[t]he eleventh amendment's bar extends to suits against departments or agencies of the state having no existence apart from the state." Laskaris v. Thornburgh, 661 F.2d 23, 25 (3d Cir. 1981) (citing Mt. Healthy City Bd. of Educ. v. Doyle, 429 U.S. 274, 280 (1977)). See also Capogrosso v. Supreme Court of N.J., 588 F.3d 180, 185 (3d Cir. 2009).

Insofar as a plaintiff seeks monetary damages, it is clear that he can only pursue such damages against state officials in their individual or personal capacity. Brown v. Culp, 2011 WL 6003900, *5 (M.D. Pa. Oct. 27, 2011) (citing Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989); Mitchell v. Luckenbill, 680 F. Supp. 2d 672, 681 (M.D. Pa. 2010)). Accordingly, Plaintiff's claims for compensatory and punitive damages against the PSP Defendants in their official capacity will be dismissed.

**\*7** To state a viable § 1983 claim, a plaintiff must plead two essential elements: (1) the conduct complained of was committed by a person acting under color of state law; and (2) the conduct deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States." Natale v. Camden Cnty. Corr. Facility, 318 F.3d 575, 580-81 (3d Cir. 2003). "Personal involvement in the alleged

wrongdoing is necessary for the imposition of liability in a civil rights action." Evancho v. Fisher, 423 F.3d 347, 353 (3d Cir. 2005); Sutton v. Rasheed, 323 F.3d 236, 249-50 (3d Cir. 2003).

In addition, personal involvement cannot be imposed upon a state official based solely on a theory of respondeat superior. See Rizzo v. Goode, 423 U.S. 362 (1976); Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988).

Initially, the Court notes that Plaintiff's amended complaint fails to allege any specific actions taken by the PSP Supervisor in charge of the Megan's Law Unit that would form the basis of a § 1983 claim. The amended complaint merely alleges that the PSP Supervisor was made aware that Plaintiff was not required to register under SORNA. (Doc. 53 at 4). However, the amended complaint fails to allege any additional facts regarding how this Defendant violated Plaintiff's rights. These general and conclusory allegations, with no factual support or factual development, are not enough to make out a constitutional violation. See Iqbal, 556 U.S. at 678 ("[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do' ") (quoting Twombly, 550 U.S. at 555). This lack of factual support is fatal to Plaintiff's § 1983 claim as allegations of personal involvement must be made with particularity. See Evancho, 423 F.3d at 353; Rode, 845 F.2d at 1207.

Additionally, it appears that Plaintiff has premised his claims against the PSP Commissioner solely upon a theory of respondeat superior. There are no personal allegations against the current Commissioner, nor are there any allegations that he knew of or acquiesced in the allegedly improper conduct.[6] Because the PSP Commissioner was not personally involved in and did not acquiesce in the alleged unconstitutional conduct, all claims against him must fail.

In addressing Plaintiff's Constitutional claims, Defendants correctly argue that Plaintiff's First Amendment violation of Privacy Claim fails as a matter of law.

The Third Circuit has held that there is some nontrivial interest in one's personal information, including home addresses, by persons who do not wish such information to be disclosed. Paul P. v. Farmer, supra. However, the Third Circuit has also "made it clear that interest must give way to the state's compelling interest in notifying the public where prior sex offenders live so that susceptible individuals can

be appropriately cautioned." Id. The fundamental purpose of sex offender registration laws such as SORNA is public disclosure. As such, the Third Circuit has held that sex offender registration requirements do not violate an offender's privacy rights under the First Amendment. Id.

**8** Pennsylvania courts have also found that the various iterations of the Commonwealth's sex offender registration laws did not violate an offender's privacy rights. See Commonwealth v. Williams, 832 A.2d 962 (Pa. 2003); Commonwealth v. Howe, 842 A.2d 436, 446 (Pa. Super. 2004) (denying argument that offender's privacy rights were violated through Megan's Law II registration and notification requirements); Commonwealth v. Kopicz, 840 A.2d 342 (Pa. Super. 2003) (regarding Megan's Law II); Commonwealth v. Mountain, 711 A.2d 473 (Pa. Super. 1998) (holding offender's interest in avoiding Megan's Law disclosures outweighed by Commonwealth's interest in protecting the public).

Given the above case law, it is clear that any privacy interest Plaintiff may have in his address, photograph and personal information is outweighed by the Commonwealth's interest in protecting the public from sexual offenders. Indeed, the very purpose of SORNA's registration and notification requirements is public disclosure. Consequently, Plaintiff's First Amendment claim for violation of privacy fails as a matter of law.

To the extent that Plaintiff asserts that the PSP Defendants failed to comply with their own "standing policy" (Doc. 53 at 4), violation of agency policy does not, in and of itself, amount to a constitutional violation. See Ickes v. Borough of Bedford, 807 F. Supp. 2d 306, 327 (W.D. Pa. 2011) (citing Virginia v. Moore, 533 U.S. 164, 168-78 (2008) ("a violation of Bedford's taser policy does not necessarily constitute a violation of the Fourth Amendment")); Davis v. Wigen, 1995 WL 422790, *2 (E.D. Pa. July 13, 1995) (citing James v. Quinlan, 866 F.2d 627, 631 (3d Cir. 1989) ("plaintiff cannot rely on an internal Bureau of Prisons procedure to establish a constitutional violation")). Without more, Plaintiff's constitutional claim fails.

Although not clearly defined, Plaintiff claims that his continued registration and dissemination of his personal information under SORNA constitutes cruel and unusual punishment in violation of both the Pennsylvania Constitution and the Eighth Amendment. To the extent that Plaintiff might be alleging that SORNA's registration and notification requirements are punitive in nature, both the Commonwealth

Court and the Superior Court have held that SORNA's registration requirements are non-punitive in nature and, therefore, retroactive application of SORNA is constitutional under both the federal and state ex post facto clauses. See Coppolino v. Noonan, 102 A.3d 1254 (Pa. Cmwlth. 2014); Commonwealth v. Perez, 97 A.3d 747, 760 (Pa. Super. 2014) ("we conclude that the new registration regime pursuant to SORNA is constitutional under the Federal and State Ex Post Facto Clauses"). See also Dunyan v. Pennsylvania State Police, No. 75 M.D. 2014, 2014 WL 10298850, at *4 (Pa. Cmwlth. Dec. 17, 2014). Moreover, prior versions of SORNA, namely Megan's Law I and II, have been determined to be non-punitive by the Pennsylvania Supreme Court. See Commonwealth v. Williams, 832 A.2d 962, 986 (Pa. 2003); Commonwealth v. Gaffney, 733 A.2d 616 (Pa. 1999). Based on the forgoing, the Court finds no merit to Plaintiff's Eighth Amendment claim.

To the extent that Plaintiff purportedly asserts state law defamation, libel and negligence claims against the PSP Defendants, (see Doc. 53), these claims are entitled to dismissal as the PSP Defendants are entitled to sovereign immunity.

It is well established that the Commonwealth and its employees and officials enjoy immunity from most state law claims. See 1 Pa.C.S.A. § 2310; Brautigam v. Fraley, 684 F. Supp. 2d 589, 593 (M.D. Pa. 2010) ("If the Commonwealth is entitled to sovereign immunity ... then its officials and employees acting within the scope of their duties are likewise immune") (quoting Moore v. Commonwealth, 538 A.2d 111, 115 (Pa. Cmwlth. 1988)); see also Larsen v. State Employees' Retirement System, 553 F. Supp. 2d 403, 420 (M.D. Pa. 2008) (holding "[s]overeign immunity applies to Commonwealth employees in both their official and individual capacities"). The Pennsylvania General Assembly has provided only nine specific exceptions to this general grant of immunity, none of which are applicable in this case. See 42 Pa.C.S. § 8522(b).[7] Moreover, this Court has specifically held that Commonwealth agency employees are entitled to sovereign immunity for state law defamation claims. See Boone v. Pa. Office of Vocational Rehabilitation, 373 F. Supp. 2d 484, 495 (M.D. Pa. 2005) (citing Yakowicz v. McDermott, 548 A.2d 1330 (Pa. Cmwlth. 1988)). Accordingly, PSP Defendants are entitled to sovereign immunity on Plaintiff's state law claims.[6]

**\*9** Plaintiff admittedly plead guilty to the charges of Corruption of Minors, 18 Pa.C.S. § 6301(a)(1), and Indecent Assault, 18 Pa.C.S. § 3126(a)(1). Pursuant to SORNA, this

particular charge of Indecent Assault found at subsection (a) (1) is considered a Tier I offense, 42 Pa.C.S. § 9799.14, for which Plaintiff is required to register for a period of fifteen (15) years. 42 Pa.C.S. § 9799.15. SORNA mandates that PSP create and maintain a statewide registry of sexual offenders, including an electronic database and digitized records. 42 Pa.C.S. § 9799.16(a). In addition, SORNA states:

> The Pennsylvania State Police **shall** ... (1) [d]evelop and maintain a system for making information about individuals **convicted of a sexually violent offense**, sexually violent predators and sexually violent delinquent children publicly available by electronic means via an Internet website.

42 Pa.C.S. § 9799.28(a) (emphasis added). It is not just sexually violent predators whose information is posted on PSP's website, but those convicted of a sexually violent offenses as well. Therefore, Plaintiff's claim that individuals convicted of a sexually violent offense are not required to register under SORNA and are not to be placed on the Megan's Law website is simply incorrect, and Defendants, PSP, are entitled to dismissal.

Moreover, Plaintiff is not listed on PSP's Megan's Law website as a sexually violent predator – he is properly listed as a Tier I offender. The allegedly "derogatory" or "defamatory" statements on the website that Plaintiff complains of are nothing more than statements that Plaintiff has plead guilty to Indecent Assault, 18 Pa.C.S. § 3126(a)(1), and is currently registered with the PSP, facts which Plaintiff himself acknowledges to be true.[7]

Finally, the particular offense Plaintiff pled guilty to requires him to register for a period of fifteen (15) years as a Tier I offender. 42 Pa.C.S. § 9799.15. In addition, PSP is mandated to create and maintain a statewide registry of sexual offenders, 42 Pa.C.S. § 9799.16(a), and shall develop and maintain a system for making information about these individuals available to the public through the Internet. 42 Pa.C.S. § 9799.28. PSP has no discretion when it comes to SORNA's registration and notification requirements, and the PSP Defendants cannot exempt an individual Plaintiff or consider cases on an individualized basis. Registration and notification requirements are based purely upon an individual's conviction for an enumerated offense. Moreover, Plaintiff's plea agreement specifically states there was "[n]o agreement on sentence" and there is nothing in the agreement indicating the period of time Plaintiff would have to register. (See Doc. 58-1 at 2). Plaintiff's argument that an individual

named Towanda Stalling – allegedly an employee of the Department of Corrections – informed the Defendants that Plaintiff was not required to register is unavailing. Absent a valid court order, the PSP Supervisor in charge of the Megan's Law Unit and the Commissioner of the PSP have no power to remove or exempt Plaintiff from the registry. Thus, PSP Defendants' motion to dismiss will be granted.

## V. CONCLUSION

For the reasons stated above, Defendants' motions to dismiss Plaintiff's amended complaint will be granted. Because

Plaintiff has already been afforded an opportunity to file an amended complaint, this Court need not give him yet another opportunity to amend his Complaint. A separate Order will be issued.

Date: September 30, 2016.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 5796895

Footnotes

1   "Defendant Mark Kijek was incorrectly spelled as 'Kiak' in Plaintiff's Complaint." (Doc. 27, p. 1 n.1). By separate Order, dated September 30, 2015, the Court directed the Clerk of Court to amend the docket sheet to accurately reflect the correct spelling of this party's name. (See Doc. 50).

2   A court may take judicial notice of the contents of another court's docket. See Orabi v. Att'y Gen. of the United States, 738 F.3d 535, 537 n.1 (3d Cir. 2014) (citing Mar. Elec. Co. v. United Jersey Bank, 959 F.2d 1194, 1200 n.3 (3d Cir. 1991); Porter v. Ollison, 620 F.3d 952, 954-55 (9th Cir. 2010); Singh v. U.S. Dep't of Homeland Sec., 526 F.3d 72, 80 n.9 (2d Cir. 2008)).

3   It is well-settled in this Circuit that matters of public record may be considered without converting a motion to dismiss into one for summary judgment. Schmidt v. Skolas, 770 F.3d 241 (3d Cir. 2014). Official court dockets and information contained in court files are matters of public record of which the court can take judicial notice. See City of Pittsburgh v. West Penn Power Co., 147 F.3d 256, 259 (3d Cir. 1998). The Adult Probation Defendants have also incorporated into this brief the position paper of the Pennsylvania Board of Probation and Parole governing registration of sexual offenders pursuant to the provision of the Pennsylvania laws commonly know as the Megan's Law and the Adam Walsh Act. As such, it is permissible for this Court to consider the PA Board of Probation and Parole's directive to County Probation Officers relative to registration of sexual offenders. See Pension Benefit Guaranty Corp., 998 F.2d 1192, 1197 (3d Cir. 1993) (explaining that "public record [s]" in this context are materials like decision letters of government agencies and published reports of administrative bodies).

4   2014 U.S. Dist. LEXIS 30269 (D. Del. 2014) (Fallon, M.J.).

5   The United States Court of Appeals for the Third Circuit has ruled categorically that sexual offender registration requirements do not violate the offender's privacy rights under the First Amendment. See, e.g., Paul P. v. Farmer, 227 F.3d 98 (3d cir. 2000).

6   To the extent that Plaintiff makes the conclusory statement in his amended complaint that the PSP Commissioner "was negligent in the training of officers and failed to create and or enforce standards that would have protected the rights of plaintiff," (see Doc. 53 at 4), this general, conclusory statement with absolutely no factual support or development is not enough to state a claim for failure to train or supervise. See Iqbal, 556 U.S. at 678; Twombly, 550 U.S. at 570; Evancho, 423 F.3d at 351.

7   The nine categories of cases for which immunity has been waived are vehicle liability; medical-professional liability; care, custody and control of personal property; Commonwealth real estate, highways and sidewalks; potholes and other dangerous conditions; care, custody and control of animals; liquor store sales; National Guard activities; and toxoids and vaccines. 42 Pa.CS. § 8522(b).

6   To the extent that Plaintiff argues in his brief in opposition (Doc. 62) that his state law tort claims fall under the personal property exception to sovereign immunity, Plaintiff's claim is without merit. The exception to sovereign immunity dealing with personal property provides:

     (3) Care, custody or control of personal property.—

     The care, custody or control of personal property in the possession or control of Commonwealth parties, including Commonwealth-owned personal property and property of persons held by a Commonwealth agency, except that the

sovereign immunity of the Commonwealth is retained as a bar to actions on claims arising out of Commonwealth agency activities involving the use of nuclear and other radioactive equipment, devices and materials.

42 Pa.C.S.§ 8522(b)(3). Plaintiff's claims surround the publication on PSP's Megan's Law website of his name, photograph and identifying information. This information, however, does not constitute "personal property" and, therefore, the exception to sovereign immunity does not apply.

7    Plaintiff's information on the Megan's Law website can be found at: http://www.pameganslaw.state.pa.us/OffenderDetail.aspx?Offender=31113.

---

**End of Document**                                                     © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Warren v. Matthey, Not Reported in Fed. Supp. (2016)

2016 WL 215232, 82 ERC 1207

2016 WL 215232
United States District Court, E.D. Pennsylvania.

Bradley WARREN and Paula
Gay Warren, Plaintiffs,

v.

Johnson MATTHEY,
Inc. et al., Defendants.

CIVIL ACTION NO. 15-01919
|
Signed 01/19/2016

**Attorneys and Law Firms**

Urs B. Furrer, Harriton & Furrer, LLP, Armonk, NY, for Plaintiffs.

Amy Lorraine Donohue-Babiak, Johnson Matthey Inc., Wayne, PA, Cathleen M. Devlin, Christina D. Riggs, Saul Ewing LLP, Benjamin G. Stonelake, Francis X. Crowley, Thomas M. Duncan, Blank Rome LLP, Sarah Damiani, Conrad O'Brien, Philadelphia, PA, Alan Paul Novak, Helen J. Esbenshade, Lamb McErlane PC, West Chester, PA, Shannon A. Deharde, Leonard Fornella, Babst, Calland, Clements & Zomnir, P.C., Kathy K. Condo, Babsst Calland Clements & Zomnir, P.C., Pittsburgh, PA, Garrett Douglas Trego, Suzanne Ilene Schiller, Manko Gold Katcher & Fox LLP, Bala Cynwyd, PA, for Defendants.

**MEMORANDUM**

GERALD J. PAPPERT, J.

**\*1** Plaintiffs Bradley and Paula Gay Warren ("the Warrens") sued Defendants Johnson Matthey, Inc. ("Johnson Matthey"), Whittaker Corp. ("Whittaker"), Marcegaglia USA, Inc. ("Marcegaglia") and Constitution Drive Partners, L.P. ("Constitution Drive") (collectively "Defendants"),[1] seeking recovery under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9601 et seq., and the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 et seq. The Warrens also assert causes of action under Pennsylvania state law, including: (1) claims under the Pennsylvania Hazardous Sites Cleanup Act ("HSCA"), 35 Pa. Cons. Stat. § 6020.101 et seq.; (2) negligence per se; (3) private nuisance; (4)

strict liability; (5) trespass; and (6) medical monitoring. Defendants move to dismiss the Warrens' amended complaint. For the reasons that follow, Defendants' motions to dismiss the Warrens' federal claims are granted. The Court will not exercise supplemental jurisdiction over the remaining state law claims. Those claims are accordingly dismissed without prejudice.

**I.**

From 1951 to 1999, the site located at 1 Malin Road, Malvern, Pennsylvania ("Bishop Tube Site" or "the Site"), was used to manufacture and process metal alloy tubes and related equipment. (Am. Compl. ¶ 18, ECF No. 8.) At various points throughout that time period, Johnson Matthey, Whittaker and Marcegaglia each individually owned and/or operated the Bishop Tube Site. (Id. ¶¶ 19–32.) Constitution Drive currently owns the Site. (Id. ¶ 50.)

In 1980, the United States Environmental Protection Agency ("EPA") added the Bishop Tube Site to the Comprehensive Environmental Response, Compensation and Liability List ("CERCLIS").[2] (Id. ¶ 42.) In 1983, the Pennsylvania Department of Environmental Protection ("PADEP") conducted a non-invasive, non-sampling preliminary assessment of the Site. (Id. ¶ 43.) Two years later, the EPA conducted a subsurface investigation of the Site. (Id. ¶ 44.) From 1981 to 1999, "partial characterizations" were conducted at the Bishop Tube Site. (Id. ¶ 45.) In 1999, the PADEP took over response actions at the Site to conduct: (1) periodic sampling of the soil, surface water and groundwater; (2) vapor intrusion pathway analysis; and (3) maintenance of monitoring wells in the contaminated aquifer. (Id. ¶ 49.)

**\*2** The Warrens' home is located near the Bishop Tube Site at 54 Conestoga Road, Malvern, Pennsylvania. (Id. ¶¶ 5–6.) The Warrens allege that during their respective periods of ownership, Defendants "used or permitted the use of hazardous substances, including trichloroethylene ("TCE"), during the manufacturing process for their seamless stainless steel and other products." (Id. ¶ 37.) The EPA has classified TCE as a known carcinogen.[3] (Id. ¶ 38.) As a result of Defendants' actions, TCE was disposed into the Bishop Tube Site's soils and groundwater. (Id. ¶ 39.) Subsurface migration of the groundwater reached the aquifer beneath the Warrens' property, and as a result, contaminated their well water. (Id. ¶ 40.) The Warrens allege that the contaminated drinking water "poses an imminent and substantial endangerment to their

**Warren v. Matthey, Not Reported in Fed. Supp. (2016)**

2016 WL 215232, 82 ERC 1207

health and safety." (*Id.* ¶ 41.) They contend that Constitution Drive has conducted response actions under agreement with the PADEP which include "the installation of a soil vapor extraction and air sparging system designed to capture and remove contamination from subsurface soils at the Bishop Tube Site." (*Id.* ¶ 51.) The Warrens allege however that "none of the Defendants have taken any steps to actively and effectively remediate the contamination...which has and continues to migrate onto the Warren property and neither the EPA nor the PADEP have taken any steps to compel such remedial activity." (*Id.* ¶ 52.)

The Warrens filed their initial complaint on April 13, 2015. (ECF No. 1.) Johnson Matthey filed a motion to dismiss the complaint on July 27, 2015. (ECF No. 5.) The Warrens filed a response on August 10, 2015 (ECF No. 6), but two days later, filed an amended complaint rendering Johnson Matthey's motion moot. (ECF No. 8.) Defendants filed their respective motions to dismiss the amended complaint[4] (ECF Nos. 11, 17, 18, 33) and the Warrens filed their responses. (ECF Nos. 19, 21, 22, 37.) The Court heard oral argument on the motions on November 23, 2015. (ECF No. 47.) At oral argument, the Court requested that the parties submit supplemental briefing on the following three issues: (1) the Court's ability to consider documents relating to the PADEP remedial and investigative processes at the Bishop Tube Site; (2) the Court's ability to consider an Amended Consent Order pursuant to which Whittaker and Johnson Matthey, under the direction of the PADEP, are engaging in remedial work at the Bishop Tube Site; and (3) the Court's ability to consider the existence and effect of a water filtration system installed in the Warrens' home. (Oral Arg. 75:14–76:8; 80:2–7; 83:16–24.)

## II.

Defendants move to dismiss the Warrens' claims under [Federal Rule of Civil Procedure 12(b)(1)](#) for lack of subject matter jurisdiction and/or [Rule 12(b)(6)](#) for failure to state a claim upon which relief can be granted.[5]

### A.

A party's [Rule 12(b)(1)](#) motion "may be treated as either a facial or factual challenge to the court's subject matter jurisdiction." *[Gould Elecs. Inc. v. United States](#)*, 220 F.3d 169, 176 (3d Cir. 2000) *modified, [Simon v. United States](#)*, 341 F.3d 193 (3d Cir. 2003) (referencing *[Mortensen v. First Fed. Sav. and Loan Ass'n](#)*, 549 F.2d 884, 891 (3d Cir. 1977)). When presented with a facial attack, the Court "must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff." *Id.* When analyzing a factual attack however, "the court may consider evidence outside the pleadings," *id.* (referencing *[Gotha v. United States](#)*, 115 F.3d 176, 178–79 (3d Cir. 1997) (citing *[Mortensen](#)*, 549 F.2d at 891)), and "no presumption of truthfulness attaches to the allegations of the plaintiff." *[CNA v. United States](#)*, 535 F.3d 132, 139 (3d Cir. 2008), *as amended* (Sept. 29, 2008). A factual attack puts the "burden of proving subject matter jurisdiction on the plaintiff." *[CNA](#)*, 535 F.3d at 139. This is so because at issue in a factual attack is the Court's "very power to hear the case." *[Mortensen](#)*, 549 F.2d at 891. "A motion to dismiss for want of standing [whether facial or factual] is...properly brought pursuant to [Rule 12(b)(1)](#), because standing is a jurisdictional matter." *[Constitution Party of Pennsylvania v. Aichele](#)*, 757 F.3d 347, 357 (3d Cir. 2014) (quoting *[Ballentine v. United States](#)*, 486 F.3d 806, 810 (3d Cir. 2007)).

**\*3** The Third Circuit Court of Appeals has "outlined procedures for ensuring that a ruling on a [Rule 12(b)(1)](#) factual attack be based on an adequate factual record." *[Gould](#)*, 220 F.3d at 177 (citing *[Int'l Ass'n of Machinists & Aerospace Workers v. Nw. Airlines, Inc.](#)*, 673 F.2d 700 (3d Cir. 1982)).

> If the defendant raises no challenge to the facts alleged in the pleadings, the court may rule on the motion by accepting the allegations as true. If the defendant contests any allegations in the pleadings, by presenting evidence, the court must permit the plaintiff to respond with evidence supporting jurisdiction. The court may then determine jurisdiction by weighing the evidence presented by the parties. However, if there is a dispute of a material fact, the court must conduct a plenary trial on the contested facts prior to making a jurisdictional determination.

*Id.* (citing *[Int'l Ass'n of Machinists](#)*, 673 F.2d at 711–12).

### B.

To survive a motion to dismiss under [Rule 12(b)(6)](#), a plaintiff must plead factual allegations sufficient "to raise a right to relief above the speculative level...on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *[Bell Atl. Corp. v. Twombly](#)*, 550 U.S. 544, 555 (2007). The "mere possibility of misconduct" is not enough. *Ashcroft*

**Warren v. Matthey, Not Reported in Fed. Supp. (2016)**

2016 WL 215232, 82 ERC 1207

*v. Iqbal*, 556 U.S. 662, 679 (2009). The complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* at 678. (quotation and citation omitted). Speculative and conclusory statements are not enough. "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions...a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. The complaint must also "give the defendant fair notice of what the ...claim is and the grounds upon which it rests."[6]*Id.*

The court must construe the complaint in the light most favorable to the plaintiff. *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 314 (3d Cir. 2010) (quoting *Gelman v. State Farm Mut. Auto. Ins. Co.*, 583 F.3d 187, 190 (3d Cir. 2009)). However, while all allegations contained in the complaint must be accepted as true, the court need not give credence to mere "legal conclusions" couched as facts. *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice." *Id.*

**\*4** To resolve a 12(b)(6) motion, courts may "consider...matters of public record." *Lum v. Bank of Am.*, 361 F.3d 217, 221 n.3 (3d Cir. 2004). The Third Circuit has defined a public record, "for purposes of what properly may be considered on a motion to dismiss, to include...letter decisions of government agencies...and published reports of administrative bodies." *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1197 (3d Cir. 1993) (internal citations omitted); *see also Kuhns v. City of Allentown*, 636 F. Supp. 2d 418, 425 (E.D. Pa. 2009).

**III.**

Count I of the Warrens' amended complaint seeks three forms of relief under CERCLA:

(1) recovery of response costs under 42 U.S.C. § 9607(a)(4)(B); (2) a declaratory judgment on liability for future response costs or damages under 42 U.S.C. § 9613(g)(2); and (3) litigation costs and fees.[7] (Am. Compl. ¶¶ 61–62, 64–65, 107(f).)

**A.**

Defendants move to dismiss Count I—insofar as it seeks recovery of response costs— under Rule 12(b)(6). CERCLA provides that:

[A]ny person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for...any ...*necessary* costs of response *incurred* by any other person *consistent with the national contingency plan*.

42 U.S.C. § 9607(a)(4)(B) (emphasis added). Recoverable response costs under § 9607(a)(4)(B) must therefore be: (1) necessary and consistent with the national contingency plan; (2) incurred by the party seeking recovery; and (3) incurred before the lawsuit. *See U.S. Virgin Islands Dep't of Planning & Nat. Res. v. St. Croix Renaissance Grp., L.L.L.P.*, 527 F. App'x 212, 214 (3d Cir. 2013); *see also United States v. Atl. Research Corp.*, 551 U.S. 128, 129 (2007) (finding response costs can only be recovered "by a private party that has itself incurred cleanup costs"); *New Jersey Tpk. Auth. v. PPG Indus., Inc.*, 197 F.3d 96, 104 (3d Cir. 1999) (finding costs may only be pursued by an innocent party that has *undertaken* hazardous waste cleanup); *Artesian Water Co. v. Gov't of New Castle Cty.*, 659 F. Supp. 1269, 1289 (D. Del. 1987) *aff'd*, 851 F.2d 643 (3d Cir.)

1988) (finding a $10 million alternative water supply *unnecessary* where contaminants were no longer threatening drinking water).

The Warrens allege that after the migration of hazardous substances onto the property, "response actions were taken and are needed which have and will result in the incurrence of response costs within the meaning of...42 U.S.C. § 9601, [and] will be consistent with the National Contingency Plan." (Am. Compl. ¶ 61.) The Warrens do not allege that *they* incurred any response costs or what response costs, if any, were actually incurred. (*See generally* Am. Compl.) Rather, they state in conclusory fashion that "response actions were taken...which have...result[ed] in the incurrence of response costs." (*Id.* ¶ 61.) The Court need not consider such "[t]hreadbare recitals" and "conclusory statements." *Iqbal*, 556 U.S. at 678.

**\*5** At oral argument however, counsel for the Warrens stated that the only response cost his clients have incurred to date is their purchasing of bottled water. (Oral Arg. 49:16–23; 60:15–61:7.) CERCLA defines "response" as "remove,

**Warren v. Matthey, Not Reported in Fed. Supp. (2016)**

2016 WL 215232, 82 ERC 1207

removal, remedy, and remedial action." 42 U.S.C. § 9601(25). "Remedial action" includes, *inter alia*, the "provision of alternative water supplies." 42 U.S.C. § 9601(24). However, those alternative water supplies must be necessary "to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment." *Id.* Counsel pointed the Court to two cases, *Mateur v. U.S. Aluminum*, No. CIV. A. 88-2147, 1989 WL 60442 (E.D. Pa. June 6, 1989) and *Coburn v. Sun Chem. Corp.*, No. CIV. A. 88-0120, 1989 WL 83518 (E.D. Pa. July 24, 1989), which purportedly stand for the position that purchasing bottled water constitutes a recoverable response cost under CERCLA.

In *Mateur*, the court denied defendant's motion for summary judgment where the plaintiff had made the requisite showing that the defendant may have been responsible for contaminating the groundwater. 1989 WL 60442, at *6. The court did not address the issue of whether bottled water constitutes a response cost under CERCLA. Similarly, the court in *Coburn* never addressed whether a party could recover the cost of purchasing bottled water. 1989 WL 83518, at *1. The Court is unaware of any cases which support the assertion that purchasing bottled water is a recoverable response cost. Even if bottled water *could* constitute a response cost, the Warrens fail to show that incurring such cost was "necessary." 42 U.S.C. § 9607(a)(4)(B).

As discussed above, *see supra* Part II(B), the Court may "consider...matters of public record" for purposes of deciding a Rule 12(b)(6) motion. *Lum*, 361 F.3d at 221 n.3. In their supplemental brief, Defendants provided a number of PADEP reports. (Defs.' Supplemental Brief ("Supp. Br.") at Exs. A–R, ECF No. 49.) Defendants argue that these reports establish that purchasing bottled water was unnecessary given the installation of a filtration system in the Warrens' home. (Defs.' Supp. Br. at 5.) Defendants contend that these records can be considered at the 12(b)(6) stage as "matters of public record." (*Id.* at 5–6.) In their supplemental response brief, the Warrens did not rebut or even challenge Defendants' position. (*See generally* Pls.' Supp. Br.) Indeed, the Warrens cite the Defendants' exhibits in their brief. (*Id.* at 3.) "Where an issue of fact or law is raised in an opening brief, but it is uncontested in the opposition brief, the issue is considered waived or abandoned by the non-movant in regard to the uncontested issue." *Markert v. PNC Fin. Servs. Grp., Inc.*, 828 F. Supp. 2d 765, 773 (E.D. Pa. 2011). Waived or not, the Court may consider the attached public records because they clearly constitute "letter decisions of government agencies...and

published reports of administrative bodies." *Pension*, 998 F.2d at 1197 (internal citations omitted). All of the reports and letters were prepared either by the PADEP or by a consultant at the agency's request. (Defs.' Supp. Br. at Exs. A–R.)

The PADEP's records establish that a Point of Entry Treatment system ("the system") was installed at the Warrens' home in 1999. (Defs.' Supp. Br. at Ex. C.) The system is comprised of two filters that remove hazardous compounds like TCE from the contaminated groundwater as it navigates from the well into the Warrens' home. (*Id.* at Ex. D.) When tested, the system's samples are taken pre-filter, mid-filter and post-filter. (*Id.*) Pursuant to EPA and PADEP standards, the Maximum Contaminant Level ("MCL") for TCE in drinking water (i.e. post-filter) is 5.0 ug/L. 40 CFR § 141.61(a); 25 Pa. Code § 109.202(a)(2). The MCL is "the maximum permissible level of a contaminant in water which is delivered to any user of a public water system." 40 CFR § 141.2. From 2002 to 2015, the system was tested by the PADEP eleven times. (Defs.' Supp. Br. at Ex. A.) The post-filter results on each test were less than 5.0 ug/L, and accordingly less than the MCL. (*Id.*) The highest level of post-filter TCE detected was 1.0 ug/L. (*Id.*)

**\*6** Results from the 2012 and 2015 samples were sent to the Warrens. (*Id.* at Exs. Q, R.) Additionally, results from six of the samples were sent to Kenneth W. Leasa—the former owner of the home and Plaintiff Paula Warren's father. (*Id.* at Exs. D, F, H, J, K, M.) If the water reaching the Warrens' home has consistently contained less TCE than the MCL—a fact that the Warrens do not dispute—it is hard to imagine why they would *need* to purchase bottled water "to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment." 42 U.S.C. § 9601(24). The Warrens therefore fail to establish, for purposes of withstanding a 12(b)(6) analysis, that purchasing bottled water was a "necessary" response cost under § 9607(a)(4)(B).

**B.**

Defendants advance a Rule 12(b)(1) facial attack against the Warrens' claim for a declaratory judgment on liability for future response costs or damages under 42 U.S.C. § 9613(g)(2). That statute provides:

In any [action for recovery of the costs referred to in section § 9607]...the court shall enter a declaratory judgment on

**Warren v. Matthey, Not Reported in Fed. Supp. (2016)**

2016 WL 215232, 82 ERC 1207

liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages.

42 U.S.C. § 9613(g)(2). A plaintiff may not obtain declaratory relief for *future* response costs under § 9613(g)(2) unless they have first incurred response costs under § 9607(a)(4) (B). See *Ambrogi v. Gould, Inc.*, 750 F. Supp. 1233, 1243 (M.D. Pa. 1990) ("Relevant case law provides that before a private party may seek declaratory relief or damages, a plaintiff must affirmatively demonstrate that he has incurred necessary costs of response.") (internal citations omitted). Because the Warrens fail to allege facts which could support a claim for response costs under § 9607(a)(4)(B), *see supra* Part III(A), they lack standing to seek declaratory relief for future response costs under § 9613(g)(2).

The Warrens also seek a declaratory judgment for future damages under § 9613(g)(2). (Am. Compl. ¶ 65.) The term "damages" in § 9613(g)(2) is defined as "damages for injury or loss of natural resources." 42 U.S.C. § 9601(6). As private parties, the Warrens lack standing to bring claims for natural resource damages under CERCLA. *See supra* note 6. "A plaintiff who lacks standing to bring an action for natural resource damages recovery also lacks standing to bring an action for declaratory judgment regarding liability for future natural resource damages recovery." *Borough of Sayreville v. Union Carbide Corp.*, 923 F. Supp. 671, 681 (D.N.J. 1996) (collecting cases). The Warrens' § 9613(g)(2) claim is accordingly dismissed pursuant to Rule 12(b)(1).

**C.**

The Warrens also seek recovery of litigation costs under CERCLA. (Pls.' Resp. to Whittaker Mot. Dis. at 9, ECF No. 22.) The United States Supreme Court has held that "CERCLA [§ 9607] does not provide for the award of private litigants' attorney's fees associated with bringing a cost recovery action." *Key Tronic Corp. v. United States*, 511 U.S. 809, 819 (1994). In some cases however, an attorney's work "that is closely tied to the *actual cleanup* may constitute a necessary cost of response in and of itself under the terms of [§ 9607(a)(4)(B)]." *Id.* at 820 (emphasis added). Fees are recoverable in these situations "because they are not incurred in pursuing litigation." *Id.* (internal citations omitted). The Warrens' claim does not fall under this narrow exception to the rule, and is therefore dismissed pursuant to Rule 12(b)(1).

**IV.**

Count II of the Warrens' amended complaint seeks injunctive relief under RCRA's citizen suit provision, 42 U.S.C. § 6972(a)(1)(B).[8] (Am. Compl. ¶ 71.) Defendants contend that the Warrens' RCRA claim should be dismissed under Rule 12(b)(6) and/or Rule 12(b)(1).

**A.**

**\*7** Defendants argue that the Warrens fail to state a claim for injunctive relief under RCRA's citizen suit provision, which states:

[A]ny person may commence a civil action on his own behalf...against any person, including...[a] past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present *an imminent and substantial endangerment to health or the environment*

. 42 U.S.C. § 6972(a)(1)(B) (emphasis added). Defendants contend that the Warrens fail to sufficiently allege, for purposes of a 12(b)(6) analysis, that the contamination poses an "imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B). An endangerment can only be "imminent" if it "threatens to occur immediately." *Meghrig*, 516 U.S. at 480. This distinction "quite clearly excludes waste that no longer presents such a danger." *Id.* A "substantial endangerment" is one which creates "some reasonable cause for concern that someone or something may be exposed to a risk of harm if remedial action is not taken." *United States v. Union Corp.*, 259 F. Supp. 2d 356, 400 (E.D. Pa. 2003) (internal citations omitted). A number of courts have found that a contaminated water supply does not pose an imminent and substantial endangerment where plaintiffs are not drinking the contaminated water. *See Two Rivers Terminal, L.P. v. Chevron USA, Inc.*, 96 F. Supp. 2d 432, 446 (M.D. Pa. 2000) ("The fact that no one is drinking this water eliminates it as a threat to health or the environment."); *see also Scotchtown Holdings LLC v. Town of Goshen*, No. 08-CV-4720, 2009 WL 27445, at *2 (S.D.N.Y. Jan. 5, 2009) ("Accordingly, courts routinely dismiss RCRA claims where, notwithstanding the existence of hazardous substances in a water supply, the specific factual

**Warren v. Matthey, Not Reported in Fed. Supp. (2016)**

2016 WL 215232, 82 ERC 1207

circumstances at issue prevent humans from actually drinking contaminated water.").

The Warrens merely allege that their "contaminated drinking water poses an imminent and substantial endangerment to their health and safety." (Am. Compl. ¶ 41.) The insufficiency of such a conclusory statement aside, the Warrens' amended complaint does not allege that they are drinking the water. (*See generally* Am. Compl.) To the contrary, counsel stated that the Warrens are drinking bottled water. (Oral Arg. 49:16–23; 60:15–61:7.) Even if they were drinking the water, the PADEP reports—which the Court can consider under a 12(b)(6) analysis as matters of public record—establish that the Warrens' drinking water is safe. *See supra* Part III(A). Such "specific factual circumstances" certainly "prevent [the Warrens] from actually drinking contaminated water." *Scotchtown*, 2009 WL 27445, at \*2. The Warrens therefore fail to sufficiently allege an imminent and substantial endangerment to their health and safety.

### B.

Defendants also assert a factual attack against the Warrens' RCRA claim under Rule 12(b)(1). RCRA grants a district court jurisdiction "to order [a person who may have contributed to endangerment] to take such...action *as may be necessary*." *Trinity Indus., Inc. v. Chicago Bridge & Iron Co.*, 735 F.3d 131, 139–40 (3d Cir. 2013) (citing 42 U.S.C. § 6972(a)(1)(B)) (emphasis added). Defendants contend that injunctive relief is unnecessary, and that the Court therefore lacks subject matter jurisdiction over the Warrens' RCRA claim. (Defs.' Supp Br. at 10.) On a factual attack, "no presumption of truthfulness attaches to the allegations," and the "burden of proving subject matter jurisdiction [rests with] the plaintiff." *CNA*, 535 F.3d at 139. Additionally, "the court may consider evidence outside the pleadings." *Gould*, 220 F.3d at 176 (referencing *Gotha*, 115 F.3d at 178–79 (citing *Mortensen*, 549 F.2d at 891)). Defendants contend that injunctive relief is unnecessary for two reasons: (1) an Amended Consent Order is currently in place before our Court pursuant to which Whittaker and Johnson Matthey, under the direction of the PADEP, are engaged in remedial work at the Bishop Tube Site;[9] and (2) the PADEP reports establish that the Warrens' drinking water is safe.

\*8 The Third Circuit in *Trinity Indus., Inc. v. Chicago Bridge & Iron Co.*, 735 F.3d 131 (3d Cir. 2013) affirmed a district court's denial of RCRA injunctive relief where

a Consent Order was in place requiring the defendant to take remedial action under the PADEP's supervision. *Id.* at 140. The denial of injunctive relief was based on the fact that the Consent Order's conditions were being effectively implemented, rendering further judicial action unnecessary. *Id.* (*comparing Ctr. for Biological Diversity, Inc. v. BP Am. Prod. Co.*, 704 F.3d 413, 431 (5th Cir. 2013) (denying injunctive relief where: executive branch was overseeing the cleanup; there was no reason to determine that that the cleanup scheme was deficient or ineffective; and the plaintiff failed to articulate how or why the Court should oversee remediation already under the executive branch's supervision), *with Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 399 F.3d 248, 267 (3d Cir. 2005) (affirming grant of injunctive relief where defendant's dilatory tactics and the New Jersey Department of Environmental Protection's inability to effectively deal with those tactics thwarted the remediation process)).

The Amended Consent Order was entered on April 9, 2012, and requires the PADEP to provide Judge Dalzell with progress reports on the remedial work being conducted by Whittaker and Johnson Matthey at the Bishop Tube Site. Amended Consent Order, *supra* note 8. The Amended Consent Order has not been vacated, overruled or otherwise modified. *Id.* Additionally, the PADEP reports establish that there is no threat to the Warrens' drinking water as all post-filter TCE levels are less than the 5.0 ug/L MCL. *See supra* Part III(A). Thus, as in *Trinity*, remedial steps have been and continue to be effective, rendering any mandatory injunction under 42 U.S.C. § 6972(a)(1)(B) unnecessary.

The Warrens were "permit[ted]...to respond with evidence supporting jurisdiction," but failed to do so. *Gould*, 220 F.3d at 177 (citing *Int'l Ass'n of Machinists*, 673 F.2d at 711–12). The Warrens contend that the "potential for vapor intrusion" exists because the filtration system only treats the groundwater entering the Warrens' home. (Pls.' Supp. Br. at 2.) In support, the Warrens provided the Court with a 130 page EPA manual on Point of Entry Treatment Systems and two graphs showing how vapor intrusion can occur. (Pls.' Supp. Br. at Exs. A–C.) While these graphs are generally informative on the topic of vapor intrusion, they shed no light on the *necessity* of an injunction in this case which would establish subject matter jurisdiction. The "potential" for vapor intrusion does not create a situation of necessity warranting judicial intervention. To the contrary, the Warrens allege that Constitution Drive has conducted response actions under agreement with the PADEP which include "the installation

**Warren v. Matthey, Not Reported in Fed. Supp. (2016)**

2016 WL 215232, 82 ERC 1207

of a soil vapor extraction and air sparging system designed to capture and remove contamination from subsurface soils at the Bishop Tube Site." (*Id.* ¶ 51.) The Warrens' effort to establish necessity is belied by their own allegations and their claim for injunctive relief under RCRA fails under Rule 12(b)(1).[10]

**V.**

**\*9** The Warrens will not be allowed to amend their complaint again. A district court may properly deny leave to amend where a party has repeatedly failed to cure deficiencies in their complaint. *See Foman v. Davis*, 371 U.S. 178, 182 (1962). Leave may also be denied where further amendment would be futile. *See id.* "'Futility' means that the complaint, as amended, would fail to state a claim upon which relief could be granted." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997) (citing *Glassman v. Computervision Corp.*, 90 F.3d 617, 623 (1st Cir. 1996) (internal citations omitted)). Thus, in assessing futility, the district court should apply "the same standard of legal sufficiency [that] applies under Rule 12(b)(6)." *Id.*

The Warrens filed their original complaint on April 13, 2015. (Compl., ECF No. 1.) Johnson Matthey filed a motion to dismiss the original complaint, asserting the exact same CERCLA and RCRA arguments articulated above. (*See* Johnson Matthey's First Mot. to Dismiss, ECF No. 5.) The Warrens filed their amended complaint which, in all material respects, mirrored their original complaint.

(*Compare* Compl., ECF No. 1, *with* Am. Compl., ECF No. 8.) The Warrens were aware of the original complaint's deficiencies, yet failed to cure those deficiencies with their amended complaint. The Warrens lack standing to obtain relief under any of their RCRA claims, and three out of four CERCLA claims. Their claim for response costs is clearly futile given that the only response cost allegedly incurred was purchasing bottled water. The Court is unaware of any precedent allowing a party to recover under CERCLA when the only alleged response cost is buying bottled water, particularly when a filtration system renders that cost unnecessary. Any amendment would be futile and Counts I and II are accordingly dismissed with prejudice.

**VI.**

The Warrens' federal claims establish the bases for this Court's jurisdiction. With the dismissal of those claims, the Court declines to exercise supplemental jurisdiction over the Warrens' remaining state law claims. *See* 28 U.S.C. § 1367(c) ("The district courts may decline to exercise supplemental jurisdiction over a claim [if] the district court has dismissed all claims over which it has original jurisdiction."). Counts III–VIII of the Warrens' amended complaint are therefore dismissed without prejudice.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 215232, 82 ERC 1207

---

Footnotes

1   The Warrens also named as defendants Bishop Tube Corp. ("Bishop Tube"), Christiana Metals Corp. ("Christiana"), Electralloy Corp. ("Electralloy"), Sonobound Ultrasonics, Inc. ("Sonobound"), Marceglaglia, S.P.A. ("MSPA") and the Central and Western Chester County Industrial Development Authority ("the Development Authority"). (ECF No. 8.) The Warrens voluntarily dismissed MSPA on September 21, 2015 (ECF No. 29) and Sonobound on December 4, 2015. (ECF No. 48.) Bishop Tube, Christiana and Electralloy have not been served or made an appearance. The Development Authority filed an answer to the Warrens' amended complaint on August 25, 2015 (ECF No. 15.), and has not filed a motion to dismiss. The Court's analysis therefore only applies to Johnson Matthey, Whittaker, Marcegaglia and Constitution Drive.

2   The EPA performs a preliminary assessment for all sites which are placed on the CERCLIS. *See United States v. Atlas Minerals & Chemicals, Inc*, No. CIV. A. 91-5118, 1995 WL 510304, at \*5 (E.D. Pa. Aug. 22, 1995). The preliminary assessment is a screening tool which constitutes the first stage of the CERCLA enforcement process. *See id.* (citing 40 C.F.R. § 300.420(b)).

3   U.S. Environmental Protection Agency, Toxicological Review of Trichloroethylene 4-632 (2011), http://cfp ub.epa.gov/ncea/iris/iris_documents/documents/toxreviews/0199tr/0199tr.pdf.

4   Defendants' motions advance the same substantive arguments in all material respects. (*See generally* ECF Nos. 11, 17, 18, 33, 49.)

Warren v. Matthey, Not Reported in Fed. Supp. (2016)

2016 WL 215232, 82 ERC 1207

5    Whittaker additionally moves for a more definite statement of the Warrens' state law claims under Rule 12(e). (Whittaker Mot. Dismiss at 23, ECF No. 17.) Because the Court declines to exercise supplemental jurisdiction over those claims, *see infra* Part VI, it need not address Whittaker's argument.

6    The Complaint generally asserts all claims against all Defendants. Certain Defendants are—by the Warrens' own allegations—incapable of liability under certain counts. For example, the Warrens allege that "none of the Defendants have taken *any* steps to actively and effectively remediate the contamination." (Am. Compl. ¶ 52.) (emphasis added). In the preceding paragraph however, the Warrens allege that "Constitution Drive has conducted limited response actions...which include[ ] the installation of a soil vapor extraction and air sparging system designed to capture and remove contamination." (*Id.* ¶ 51.) This type of catch all pleading certainly fails to give the Defendants fair notice under *Twombly* and *Iqbal.*

7    The Warrens also allege a claim for recovery of natural resource damages under 42 U.S.C. § 9607(a)(4)(C). Defendants contend that the Warrens lack standing to bring a claim under the statute. It is well settled that private parties do not have standing to assert claims for damages to natural resources under CERCLA. *See Artesian Water Co. v. Gov't of New Castle Cty.*, 851 F.2d 643, 649 (3d Cir. 1988) (citing 42 U.S.C. § 9601(16)). Counsel for the Warrens conceded that his clients lack standing to bring such claims. (Oral Arg. 16:8–23.) The Warrens' claim for recovery of natural resource damages is accordingly dismissed pursuant to Rule 12(b)(1).

8    The Warrens also allege a claim for response costs, attorneys' fees and expert witness fees under RCRA. (Am. Compl. ¶ 71.) RCRA does not provide the Court with subject matter jurisdiction over a claim for response costs. *See Meghrig v. KFC W., Inc.*, 516 U.S. 479, 486 (1996). The Warrens' remaining claim for attorneys' fees and expert witness fees is moot given the Court's dismissal of the Warrens' RCRA claim. *See infra* Part IV(A)–(B).

9    Amended Consent Order, *Commonwealth of Pennsylvania Dept. of Environmental Protection v. Whittaker Corporation*, No.08-cv-06010 (E.D. Pa. Apr. 9, 2012) (Dalzell, J.), ECF No. 19.

10    Dismissal would also be appropriate if the Court analyzed the necessity of an injunction under a 12(b)(6) standard. To resolve a 12(b)(6) motion, a court may take judicial notice of other court proceedings in addition to the allegations in the complaint. *See Southern Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp. Ltd.*, 181 F.3d 410, 426–27 (3d Cir. 1999) (collecting cases). The Third Circuit has explained that a court "may take judicial notice of another court's opinion —not for the truth of the facts recited therein, but for the existence of the opinion, which is not subject to reasonable dispute over its authenticity." *Id.* at 426. The Court may therefore look to the existence of other judicial proceedings to see if they "contradict[ ] the complaint's legal conclusions or factual claims." *Id.* at 427 (referencing *City of Pittsburgh v. W. Penn Power Co.*, 147 F.3d 256, 259 (3d Cir. 1998)).

   In support of their necessity argument, the Warrens have alleged that "none of the Defendants have taken any steps to actively and effectively remediate the contamination...which has and continues to migrate onto the Warren property and neither the EPA nor the PADEP have taken any steps to compel such remedial activity." (Am. Compl. ¶ 52.) Even setting aside their own allegation that Constitution Drive is in fact conducting "response actions ...under agreement with the PADEP," the existence of the Amended Consent Order contradicts the Warrens' assertions that nothing is being done. Amended Consent Order, *supra* note 8.

---

**End of Document**          © 2020 Thomson Reuters. No claim to original U.S. Government Works.