## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JUDICIAL WATCH, INC.,** | : | **CIVIL ACTION NO. 1:20-CV-708** |
| | : | |
| **Plaintiff** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **COMMONWEALTH OF** | : | |
| **PENNSYLVANIA**, *et al.*, | : | |
| | : | |
| **Defendants** | : | |

## <u>MEMORANDUM</u>

Plaintiff Judicial Watch, Inc., commenced this civil action against various state and county election officials pursuant to the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20501 *et seq.* Judicial Watch alleges that all defendants have failed to fulfill their list-maintenance obligations under the NVRA, and that certain defendants have also violated the NVRA's disclosure requirements. The county defendants move to dismiss Judicial Watch's claims against them under Federal Rule of Civil Procedure 12(b)(6). For the reasons that follow, we will grant the motion to dismiss.

## I.      <u>Factual Background & Procedural History</u>

Judicial Watch is a nonprofit educational organization. (<u>See</u> Doc. 1 ¶ 4). Judicial Watch describes its mission as "promot[ing] transparency, integrity, and accountability in government and fidelity to the rule of law." (<u>Id.</u> ¶ 29). It fulfills this mission "through public records requests and litigation, among other means." (<u>Id.</u>)

Judicial Watch names 14 defendants in its complaint.  We refer to the first two defendants, the Commonwealth of Pennsylvania and Veronica Degraffenreid, Acting Secretary of the Commonwealth of Pennsylvania,[1] as the "Commonwealth defendants."  (See id. ¶¶ 5-6).  We refer to all other named defendants as the "county defendants."  The county defendants are the Bucks County Commission; the Bucks County Board of Elections; the Bucks County Registration Commission; Thomas Freitag, Elections Director for Bucks County; the Chester County Commission; the Chester County Board of Elections; the Chester County Registration Commission; Sandra Burke, Director of Elections for Chester County; the Delaware County Council; the Delaware County Board of Elections; the Delaware County Registration Commission; and Laureen Hagan, Chief Clerk of the Elections Bureau for Delaware County.  (See id. ¶¶ 5-18).  The individual defendants are sued in their official capacities only.  (See id. ¶¶ 6, 10, 14, 18).

In June of 2019, the United States Election Assistance Commission ("EAC") published its biennial report to Congress as required by law.[2]  Federal regulations require states to provide various kinds of election data to the EAC for use in this report.  See 11 C.F.R. § 9428.7(b); (Doc. 1 ¶ 26).  Among the data to

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Acting Secretary Degraffenreid is automatically substituted as a defendant for former Secretary Kathy Boockvar.  See Fed. R. Civ. P. 25(d).

[2] See U.S. Election Assistance Comm'n, Election Administration & Voting Survey, 2018 Comprehensive Report, A Report to the 116th Congress (2019) (hereinafter "2018 EAC Report"), https://www.eac.gov/sites/default/files/eac_assets/1/6/2018_EAVS_Report.pdf; see also 52 U.S.C. § 20508(a)(3); (Doc. 1 ¶¶ 26, 34).

be reported are: (1) the total number of active and inactive voters registered in the state for each of the last two general federal elections, <u>see</u> 11 C.F.R. § 9428.7(b)(1)-(2), and (2) the number of registrations removed from the state's official voter lists "for whatever reason" between the past two elections, <u>see</u> <u>id.</u> § 9428.7(b)(5).  The EAC collects this data by sending a survey to each state, to be completed by the state's chief election official "in consultation with their county and local officials." (Doc. 1 ¶ 35); 11 C.F.R. § 9428.7(a).  The EAC publishes its underlying datasets—a massive spreadsheet documenting each state's responses to the 2018 EAC Survey questions to the jurisdictional level—together with its annual report.[3]  The EAC published revised datasets for the 2018 EAC Report on October 22, 2019, February 18, 2020, and July 15, 2020.[4]

Judicial Watch reviewed the 2018 EAC Report after its release.  (Doc. 1 ¶ 36). Judicial Watch also reviewed the February 18, 2020 datasets accompanying the report.  (<u>See</u> <u>id.</u> ¶ 35).  Judicial Watch concluded that the three county defendants reported too few registration removals in response to Question A9e of the 2018 EAC Survey, which requested the number of registrations removed for "[f]ailure

---

[3] <u>See</u> *Surveys and Data*, U.S. ELECTION ASSISTANCE COMM'N, https://www. eac.gov/research-and-data/datasets-codebooks-and-surveys (download "EAVS Datasets Version 1.0 (released June 27, 2019)").

[4] <u>See</u> <u>id.</u> (download "EAVS Datasets Version 1.1 (released October 22, 2019)," "EAVS Datasets Version 1.2 (released February 18, 2020)," or "EAVS Datasets Version 1.3 (released July 15, 2020)").

to respond to notice sent and failure to vote in two most recent federal elections."[5]
Judicial Watch believed the number of removals reported in the February 18, 2020
datasets for Question A9e—eight in Bucks County, five in Chester County, and four
in Delaware County—were "absurdly small," indicating "a multi-year failure by
those jurisdictions to comply with the core requirements of Section 8(d)(2) of the
NVRA."  (Doc. 1 ¶¶ 39-41, 43-44); see also 52 U.S.C. § 20507(d)(1)(B), (2).

Judicial Watch also analyzed the total voter registrations reported in the 2018
EAC Report and, using "the best available census data," calculated each defendant
county's "registration rate."  (See Doc. 1 ¶¶ 51-52).  To calculate these rates, Judicial
Watch divided each county's total voter registrations by the number of voting-age
citizens within the county.  (See id. ¶ 52).  These calculations produced registration
rates of 96 percent for Bucks County and 97 percent for both Chester County and
Delaware County.  (Id. ¶¶ 53-55).  Judicial Watch alleges that these rates "are high
in comparison to other counties in Pennsylvania, and high in comparison to other
counties throughout the U.S." and "are abnormally high."  (Id. ¶¶ 56-57).  It claims
that this too indicates a failure to comply with the NVRA's list-maintenance
requirements.  (See id. ¶ 58).

On December 11, 2019, Judicial Watch sent letters to each group of county
defendants and to former Secretary Boockvar outlining its concerns.  (See id. ¶ 59;
Docs. 1-2, 1-3, 1-4).  In each letter, Judicial Watch articulated the above conclusions,

---

[5] (See id. ¶¶ 38-41, 43); see also U.S. ELECTION ASSISTANCE COMM'N, 2018
ELECTION ADMINISTRATION & VOTING SURVEY (EAVS) 10, https://www.eac.gov/
sites/default/files/eac_assets/1/6/2018_EAC_Election_Administration_and_Voting_
Survey_Instrument.pdf.

stated its belief that the defendant county was committing a "clear violation[]" of the NVRA by failing to properly maintain its voter lists, and warned that "if the foregoing violations are not corrected within 90 days of your receiving this letter, Judicial Watch and those on whose behalf it has sent this letter may commence an action against you in federal court."  (See Doc. 1-2 at 1-3; Doc. 1-3 at 1-3; Doc. 1-4 at 1-3).  Each letter also included specific requests for documents pertaining to the county defendants' list-maintenance activities.  (See Doc. 1-2 at 3-4; Doc. 1-3 at 3-4; Doc. 1-4 at 3-4).  Bucks County and Chester County sent responsive letters directing Judicial Watch to reports compiled by the Pennsylvania Department of State.  (See Doc. 1 ¶¶ 63-76).  Delaware County did not respond or provide any documents to Judicial Watch.  (Id. ¶¶ 77-79).

Judicial Watch filed its complaint in this case on April 29, 2020, asserting violations of the NVRA's list-maintenance requirements (Count I) and its disclosure requirements (Count II).  The Commonwealth defendants answered the complaint, and the county defendants filed the instant motion to dismiss pursuant to Rule 12(b)(6).  The motion to dismiss is now fully briefed and ripe for disposition.[6]

## II.   **Legal Standard**

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for the dismissal of complaints that fail to state a claim upon which relief may be granted. FED. R. CIV. P. 12(b)(6).  When ruling on a motion to dismiss under Rule 12(b)(6), the

---

[6] The Commonwealth defendants filed a motion for judgment on the pleadings on March 4, 2021.  (See Doc. 54).  The motion will be addressed by separate memorandum and order once it is briefed.

court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008) (quoting Pinker v. Roche Holdings, Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002)).  In addition to reviewing the facts contained in the complaint, the court may also consider "exhibits attached to the complaint, matters of public record, [and] undisputedly authentic documents if the complainant's claims are based upon these documents." Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010) (citing Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993)).

Federal notice and pleading rules require the complaint to provide "the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Phillips, 515 F.3d at 232 (alteration in original) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  To test the sufficiency of the complaint, the court conducts a three-step inquiry.  See Santiago v. Warminster Township, 629 F.3d 121, 130-31 (3d Cir. 2010).  In the first step, "the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'"  Id. at 130 (alteration in original) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 675 (2009)).  Next, the factual and legal elements of a claim must be separated; well-pleaded facts are accepted as true, while mere legal conclusions may be disregarded.  Id. at 131-32; see Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009).  Once the court isolates the well-pleaded factual allegations, it must determine whether they are sufficient to show a "plausible claim for relief."  Iqbal, 556 U.S. at 679 (citing Twombly, 550 U.S. at 556); Twombly, 550

U.S. at 556.  A claim is facially plausible when the plaintiff pleads facts "that allow[]

the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged."  Iqbal, 556 U.S. at 678.

**III.**    **Discussion**

The NVRA regulates voter registration.  Congress codified the NVRA's

purpose in its opening section:

> (1) to establish procedures that will increase the number
> of eligible citizens who register to vote in elections for
> Federal office; (2) to make it possible for Federal, State,
> and local governments to implement this chapter in a
> manner that enhances the participation of eligible citizens
> as voters in elections for Federal office; (3) to protect the
> integrity of the electoral process; and (4) to ensure that
> accurate and current voter registration rolls are
> maintained.

52 U.S.C. § 20501(b).  States must establish voter registration practices and

procedures consistent with these maxims.  See id. § 20503(a).

Judicial Watch asserts two claims for alleged violations of the NVRA.  In

Count I, Judicial Watch asserts that all defendants have failed to meet certain list-

maintenance obligations under Section 8(a)(4) of the NVRA, 52 U.S.C. § 20507(a)(4).

In Count II, Judicial Watch contends that Acting Secretary Degraffenreid and the

Chester County and Delaware County defendants have also failed to meet their

disclosure obligations under Section 8(i) of the NVRA, 52 U.S.C. § 20507(i).  The

county defendants move to dismiss Count I on its merits and Count II for failure

to provide requisite statutory notice.

### A.    Count I: List-Maintenance Obligations

The NVRA prohibits states from removing registered voters from official

voter lists unless the registrant requests removal, state law mandates removal, or

the registrant is required to be removed under Section 8(a)(4).  <u>See</u> 52 U.S.C.

§ 20507(a)(3).  Section 8(a)(4) in turn mandates that states shall

> conduct a general program that makes a reasonable
> effort to remove the names of ineligible voters from the
> official lists of eligible voters by reason of--
>
> (A) the death of the registrant; or
>
> (B) a change in the residence of the registrant, in
> accordance with subsections (b), (c), and (d).

<u>Id.</u> § 20507(a)(4).  At issue here is removal based on a change of address under

subsection (d).  (<u>See</u> Doc. 1 ¶¶ 21, 43-46).  Subsection (d) states that a registrant

cannot be removed from the official voter list unless they (A) confirm in writing that

they have moved outside the jurisdiction, <u>see</u> 52 U.S.C. § 20507(d)(1)(A), or (B) fail

to respond to an address-confirmation notice and then fail to vote in the next two

general federal elections, <u>see</u> <u>id.</u> § 20507(d)(1)(B).

Judicial Watch alleges in Count I that the county defendants have failed

to remove inactive voters rendered ineligible by operation of subsection (d)(1)(B).

(<u>See</u> Doc. 1 ¶¶ 34-58, 95-99).  The county defendants dispute, as a threshold matter,

whether Section 8(a)(4) requires them to endeavor to remove voters who become

ineligible under *both* change-of-address provisions, or whether those provisions

are merely "some examples of appropriate programming" the use of which "is not

required."  (Doc. 35-1 at 11-12).  In their reply brief, the county defendants elaborate

on this theory, acknowledging that the NVRA requires them "to remove voters on the basis of change of residence," but asserting "it does *not require* them to do so by using *both* procedures" set forth in subsection (d)(1).  (See Doc. 49 at 10-11).

This interpretation finds no support in the plain language of the NVRA. Section 8(a)(4) is unambiguous: states must make a reasonable effort to remove from their official voter lists any registrants who are "ineligible . . . by reason of . . . a change in the residence of the registrant, *in accordance with subsections (b), (c), and (d)*."  52 U.S.C. § 20507(a)(4)(B) (emphasis added).  Subsection (d) states that a voter becomes ineligible—and thus subject to removal under Section 8(a)(4)—due to a change in residence in one of two ways: by confirming in writing that they have moved outside the jurisdiction, see id. § 20507(d)(1)(A), *or* by failing to respond to a return card and then failing to vote in the next two federal general elections, see id. § 20507(d)(1)(B).  Nothing in Section 8(a)(4) suggests, as the county defendants do, that they may pick and choose which of these two types of change-in-residence ineligibility to monitor for.  The only plausible interpretation of Section 8(a)(4) is that defendants must make reasonable efforts to remove voters rendered ineligible under *both* provisions.

Nonetheless, Judicial Watch has not plausibly alleged that the county defendants violated this obligation.  In asserting that the county defendants failed to cull registrants rendered ineligible under subsection (d)(1)(B), Judicial Watch relies almost exclusively on the EAC's February 18, 2020 datasets.  (See Doc. 1 ¶¶ 38-46; id. ¶ 35 (directing court to "survey responses . . . compiled on the [EAC] webpage under the heading 'EAVS Datasets Version 1.2 (released February 18, 2020)'")).  Fatal to

Judicial Watch's claim against the county defendants is that the datasets upon
which it relies are no longer valid: the EAC has since published revised datasets
which reflect markedly higher numbers of Section 8(d)(1)(B) registration removals
in each of the three defendant counties, and those figures are corroborated by the
Commonwealth's public records.[7]

In its complaint, Judicial Watch quotes Question A9e of the 2018 EAC
Survey, which asked states to identify the number of registrants removed during
the preceding two-year period for "[f]ailure to respond to notice sent and failure to
vote in two most recent federal elections." (See Doc. 1 ¶ 38). Judicial Watch then
directs the court to the EAC's February 18, 2020 datasets, which indicate that Bucks
County removed only eight registrations in this category, Chester County removed
only five, and Delaware County removed just four. (Id. ¶¶ 39-41). Judicial Watch

---

[7] The county defendants rely primarily on two public records in support of
their motion: the EAC's July 15, 2020 datasets, and the Pennsylvania Department of
State's annual reports to the Pennsylvania General Assembly on the administration
of voter registration in Pennsylvania. (See Doc. 35-1 at 12-13; Doc. 49 at 6-9; see also
Docs. 35-2, 35-3). Judicial Watch never acknowledges the revised EAC datasets. As
to the Commonwealth's reports, Judicial Watch asseverates that we cannot consider
them because they are not "undisputedly authentic" and its claims are not "based
upon" these documents. (See Doc. 46 at 15-16). Judicial Watch correctly notes that,
in resolving a Rule 12 motion, the court "must consider only the complaint, exhibits
attached to the complaint, matters of public record, [and] undisputedly authentic
documents if the complainant's claims are based upon these documents." Mayer,
605 F.3d at 230 (citing Pension Benefit Guar. Corp., 998 F.2d at 1196). But Judicial
Watch misunderstands the nature of these reports. Both the revised 2018 EAVS
Datasets and the Commonwealth's annual reports are "public records" created
and published by government entities which we may properly consider in resolving
the county defendants' motion. See Pension Benefit Guar. Corp., 998 F.2d at 1197
(observing that "a public record, for purposes of what properly may be considered
on a motion to dismiss, . . . include[s] . . . published reports of administrative
bodies"). We may and do consider these published governmental reports in
addressing the county defendants' motion.

contends that these numbers are "absurdly small" given the size of the defendant counties and their respective voter lists.  (See id. ¶ 43).  To contextualize its claim, Judicial Watch adds that, according to the 2018 EAC Report, Bucks County had 457,235 total registered voters during the relevant period; Chester County had 357,307 registered voters; and Delaware County had 403,371.  (See id. ¶ 42).

We need not determine whether these numbers are indeed "absurdly small" or otherwise indicative of a list-maintenance problem, because the public records on which Judicial Watch relies have been revised.  The EAC published its most recent datasets on July 15, 2020, after it received "updated numbers for A9e," the precise survey question at issue here, from the Commonwealth.  See Errata Note, U.S. ELECTION ASSISTANCE COMM'N (July 15, 2020), https://www.eac.gov/sites/ default/files/Research/Errata_Note_2018_EAVS_v1_3.pdf.  According to the July 15, 2020 datasets, Bucks County removed 15,714 registrants for failing to respond to an address-confirmation card and then failing to vote in the next two federal general elections; Chester County removed 11,519; and Delaware County removed 20,968.  See Surveys and Data, U.S. ELECTION ASSISTANCE COMM'N, https://www.eac.gov/ research-and-data/datasets-codebooks-and-surveys (download "EAVS Datasets Version 1.3 (released July 15, 2020)").

The revised EAC datasets are generally consistent with the figures outlined in the Pennsylvania Department of State's annual reports on voter registration.  See Annual Reports on Voter Registration, PA. DEP'T OF STATE, https://www.dos.pa. gov/VotingElections/OtherServicesEvents/VotingElectionStatistics/Pages/Annual-Reports-on-Voter-Registration.aspx (last visited Mar. 8, 2021).  In its 2017 report,

the Commonwealth indicated it had removed 15,827 registrations in Bucks County,

11,647 in Chester County, and 21,134 in Delaware County, when the registrant

"did not respond to mailing after two federal elections elapsed."[8]  Its 2018 report

indicated that Bucks County had removed 830 registrants in this category, Chester

County had removed 499, and Delaware County had removed 433.[9]

Recognizing that these public records effectively torpedo its central theory,

Judicial Watch pivots in its opposition brief, claiming that the revised figures are

*still* "too low."[10]  (See Doc. 46 at 19).  Judicial Watch takes the two-year removal

totals from the 2017 and 2018 DOS Reports (16,657 for Bucks County; 12,146 for

Chester County; and 21,567 for Delaware County); divides those numbers by the

total registrations reported in the 2018 EAC Report (457,235 for Bucks County;

357,307 for Chester County; and 403,371 for Delaware County); and further divides

by two "to get . . . *yearly* average" removal rates of 1.8 percent for Bucks County, 1.7

percent for Chester County, and 2.7 percent for Delaware County.  (See Doc. 46 at

---

[8] See PA. DEP'T OF STATE, THE ADMINISTRATION OF VOTER REGISTRATION IN PENNSYLVANIA: 2017 REPORT TO THE GENERAL ASSEMBLY 7, 35 (2018) (hereinafter "2017 DOS REPORT"), https://www.dos.pa.gov/VotingElections/Candidates Committees/RunningforOffice/Documents/2017%20Annual%20Report_final.pdf.

[9] See PA. DEP'T OF STATE, THE ADMINISTRATION OF VOTER REGISTRATION IN PENNSYLVANIA: 2018 REPORT TO THE GENERAL ASSEMBLY 8, 37 (2019) (hereinafter "2018 DOS REPORT"), https://www.dos.pa.gov/VotingElections/OtherServicesEvents /VotingElectionStatistics/Documents/Annual%20Reports%20on%20Voter%20Regist ration/2018%20ANNUAL%20REPORT.pdf.

[10] Judicial Watch makes this claim only with respect to the Pennsylvania Department of State reports; indeed, it does not meaningfully acknowledge the EAC's July 15, 2020 datasets or the implications thereof at all.  (See generally Doc. 46 at 15-19).  We assume for the sake of argument that it intends this response to apply to both sets of data.

18-19).  Judicial Watch then reiterates its complaint's allegation that, according to United States Census Bureau estimates, 8.2 percent of Bucks County residents and 14 percent of Chester County residents "are living in a different house than the one they were living in one year previously."[11]  (Id. at 19; see also Doc. 1 ¶¶ 65, 71).  The implication, albeit unstated, of Judicial Watch's observations is that, because the Section 8(d)(1)(B) removal rate for each county does not match or approach the estimated change-of-residence rate, the county defendants must be failing to meet their obligations under Section 8(a)(4).  (See Doc. 46 at 18-19).

This theory is implausible for several reasons.  First, and most importantly, Section 8(a)(4) does not require a perfect removal effort; it only requires states to "make[] a reasonable effort" to remove registrants who have died or changed their residence.  See 52 U.S.C. § 20507(a)(4).  Second, as the county defendants observe, Judicial Watch's averaging overlooks that the removal requirement under Section 8(d)(1)(B) is triggered by a registrant's failure to vote in a second federal general election after failing to respond to an address-confirmation card; as a result, the vast majority of these removals necessarily occur in odd-numbered years, making a two-year average unhelpful.  See 52 U.S.C. § 20507(d)(2); (see also Doc. 49 at 7 n.5).[12]  Third, Judicial Watch's suggestion that the number of Section 8(d)(1)(B)

---

[11] Judicial Watch does not provide similar Census Bureau estimates for Delaware County.  (See generally Docs. 1, 46).

[12] We note that dividing the combined two-year removal totals for 2017 and 2018 into the total registrations reported in the 2018 EAC Report yields removal rates of 3.6 percent for Bucks County, 3.4 percent for Chester County, and 5.3 percent for Delaware County.

removals should approach the number of moves estimated by the Census Bureau ignores that a person who moves can have their voter registration removed in any number of ways: Section 8(d)(1)(B) provides one mechanism, but they might also return an address-confirmation card resulting in removal under Section 8(d)(1)(A); self-report a change in address directly to the county; or confirm a move through the Pennsylvania Department of Transportation.  See 52 U.S.C. § 20507(d)(1)(A), (B); see also 2017 DOS Report, *supra*, at 7 (listing various categories for removal); 2018 DOS Report, *supra*, at 8 (same).  Judicial Watch's reliance on Census Bureau data therefore does not "nudge[]" its list-maintenance claim "across the line from conceivable to plausible."  See Iqbal, 556 U.S. at 680 (quoting Twombly, 550 U.S. at 570).

The complaint's final salvo is an allegation that the registration rates for the defendant counties indicate they are "failing to remove old, inactive registrations" from their voter lists.  (See Doc. 1 ¶ 58).  Judicial Watch avers that Bucks County has a registration rate of 96 percent, and Chester County and Delaware County have registration rates of 97 percent.  (See id. ¶¶ 53-55).  The complaint concludes that these rates are "abnormally high" and suggests that a list-maintenance failure may be to blame.  (See id. ¶¶ 57-58).

Judicial Watch fails to plead a plausible Section 8(a)(4) claim based on allegedly high registration rates.  The complaint offers no factual context for its conclusory assertion that the county defendants' registration rates are "abnormally high."  (See id. ¶¶ 51-58).  Nor does it explain what it thinks a "normal" registration rate is or should be.  (See generally id.)  Moreover, the cases cited by Judicial Watch

for the proposition that high registration rates can, on their own, state a claim for

a Section 8 violation are distinguishable.  In both cases, the registration rate was

more than 100 percent—meaning there were *more registered voters than eligible*

*voters*—and both courts reasonably inferred that there might be a list-maintenance

problem.  See Voter Intergrity Project NC, Inc. v. Wake Cnty. Bd. of Elections, 301

F. Supp. 3d 612, 618-20 (E.D.N.C. 2017) (registration rate of 104.75 percent permits

inference of Section 8 violation); Am. C.R. Union v. Martinez-Rivera, 166 F. Supp.

3d 779, 805 (W.D. Tex. 2015) (same for 105 percent rate).  Registration rates *below*

100 percent, without more, simply do not permit the same inference.

   We find that Judicial Watch fails to state a plausible claim that the county

defendants have not complied with their list-maintenance obligations under Section

8 of the NVRA.  Nonetheless, the deficiencies in this claim are factual rather than

legal in nature, and thus capable of being cured.  Therefore, and noting the county

defendants' recommendation to this effect, (see Doc. 49 at 9), we will dismiss Count

I without prejudice and with leave to amend.

   **B.    Count II: Disclosure Obligations**

   The county defendants[13] move to dismiss Count II for failure to provide

requisite pre-suit notice.  Notice is a precondition to filing suit under the NVRA.

A person aggrieved by a violation of the NVRA must first provide "written notice

of the violation to the chief election official of the State involved" before they may

---

[13] Judicial Watch does not name the Bucks County defendants in Count II, which it asserts against only Acting Secretary Degraffenreid and the Chester County and Delaware County defendants.  Our use of "the county defendants" in this section refers only to the Chester County and Delaware County defendants.

proceed with a civil action concerning that violation.  See 52 U.S.C. § 20510(b)(1)-(2).

Ordinarily, a party must wait 90 days after providing written notice before filing a

civil action, to allow the potential NVRA defendant time to correct the violation.

See id. § 20510(b)(2).  The notice period is accelerated if a violation occurs close

in time to a federal election: when a violation occurs within 120 days of a federal

election, a party need only wait 20 days before filing suit, and the notice period is

eliminated entirely when a violation occurs within 30 days of an election, see id.

§ 20510(b)(2), (3).

   The purpose of the NVRA's notice requirement is to "provide states . . . an

opportunity to attempt compliance before facing litigation."  Scott v. Schedler, 771

F.3d 831, 836 (5th Cir. 2014) (quoting Ass'n of Cmty. Orgs. for Reform Now v. Miller,

129 F.3d 833, 838 (6th Cir. 1997)) (alteration in original).  Notice is sufficient "when

it (1) sets forth the reasons that a defendant purportedly failed to comply with the

NVRA, and (2) clearly communicates that a person is asserting a violation of the

NVRA and intends to commence litigation if the violation is not timely addressed."

Pub. Int. Legal Found. v. Boockvar, 370 F. Supp. 3d 449, 457 (M.D. Pa. 2019)

(Conner, C.J.) (citing Bellitto v. Snipes, 268 F. Supp. 3d 1328, 1334 (S.D. Fla. 2017);

Project Vote, Inc. v. Kemp, 208 F. Supp. 3d 1320, 1348 (N.D. Ga. 2016); Judicial

Watch, Inc. v. King, 993 F. Supp. 2d 919, 922 (S.D. Ind. 2012)).

   Judicial Watch mailed letters to Chester County and Delaware County on

December 11, 2019, copying the Commonwealth's Secretary of State.  (See Doc. 1

¶ 59).  In the first part of the letters, Judicial Watch described the list-maintenance

requirements of Section 8(a)(4) and Section 8(d) of the NVRA.  (See Doc. 1-3 at 1-2

16

(Chester); Doc. 1-4 at 1-2 (Delaware)).  Judicial Watch then alleged that the county defendants had committed "clear violations of Section 8(a)(4) of the NVRA" by failing to remove registrants in accordance with Section 8(d)(1)(B), outlined its theory in support of that claim, and warned the county defendants that it might sue if the alleged violations were not corrected within 90 days.  (<u>See</u> Doc. 1-3 at 2-3; Doc. 1-4 at 2-3).  Judicial Watch asked each county defendant to reply with their "plans for correcting these violations."  (<u>See</u> Doc. 1-3 at 3; Doc. 1-4 at 3).

In a separate portion of each letter, Judicial Watch addressed a different section of the NVRA, Section 8(i)(1), which requires state officials to make records concerning their list-maintenance activities available to the public for inspection. (<u>See</u> Doc. 1-3 at 3; Doc. 1-4 at 3); 52 U.S.C. § 20507(i)(1).  Judicial Watch enumerated eight categories of documents and asked the county defendants to provide it with those documents "within two weeks of the date of this letter."  (Doc. 1-3 at 3-4; Doc. 1-4 at 3-4).  Judicial Watch then admonished: "If you fail to do so, we will deem it an independent violation of the NVRA."  (Doc. 1-3 at 3; Doc. 1-4 at 3).

The county defendants do not dispute that these letters constitute adequate pre-suit notice for Judicial Watch's list-maintenance claim under Section 8(a)(4). They do dispute whether the letters provide adequate pre-suit notice of Judicial Watch's separate failure-to-disclose claim under Section 8(i).  (<u>See</u> Doc. 35-1 at 16-20; Doc. 49 at 11-14).  We agree with the county defendants that they do not, for a simple reason: no disclosure violation had yet occurred at the time of Judicial Watch's letters.

The earliest a disclosure violation could have occurred was two weeks *after* the letters were sent, since Judicial Watch had given the county defendants at least that long to comply.  (See Doc. 1-3 at 3-4; Doc. 1-4 at 3-4).  The letters warned the county defendants that they might be in violation in the future, should they not timely comply with Judicial Watch's records requests under Section 8(i).  (See Doc. 1-3 at 3-4; Doc. 1-4 at 3-4).  But a prospective violation is not a realized one, and, logically, a violation cannot be noticed or cured before it occurs.  Cf. Bellitto, 268 F. Supp. 3d at 1334 ("[T]he specific purpose of the notice requirement [is] . . . to allow the potential NVRA defendant a curative period during which [they] may correct the violation identified . . . .").  Judicial Watch never provided a post-violation notice specific to its failure-to-disclose claim to alert the defendants that it thought their responses (or lack thereof) were insufficient, and it thus deprived them of their

statutorily mandated opportunity to cure that perceived deficiency prior to suit.[14]

It would "defy logic and frustrate the purpose of the NVRA's notice provision" to

permit Judicial Watch's December 2019 letters to "serve such a dual purpose—

that is, make an initial request for records and at the same time notify the records

keeper of his or her failure to satisfy that request." See id. at 1334-35 (dismissing

unnoticed failure-to-disclose claim that "sought to 'piggyback'" on duly noticed list-

maintenance claim).  We will thus dismiss Count II without prejudice for failure to

provide proper notice under the NVRA.

---

[14] Judicial Watch cites a string of cases to support its view that "the NVRA does not require Plaintiff to send a second notice of violation letter."  (Doc. 46 at 22). This argument fundamentally misapprehends the issue: the county defendants do not argue that Judicial Watch was required to send a *second* notice of violation; they argue that, as to the failure-to-disclose claim, it never sent a *first* notice of violation. Moreover, no case cited by Judicial Watch considered whether a preemptive, pre-violation notice would satisfy the NVRA.  In Judicial Watch, Inc. v. Lamone, 399 F. Supp. 3d 425 (D. Md. 2019), Judicial Watch (as here) sent an omnibus notice of violation (claiming defendants had violated Section 8(a)(4)'s list-maintenance requirement) and request for records (requesting disclosure of certain documents under Section 8(i)).  See Lamone, 399 F. Supp. 3d at 430-31.  Defendants did not argue that the failure-to-disclose claim had been prematurely noticed; the parties' dispute, and the court's analysis, centered on the phrasing used in Judicial Watch's request and whether the documents it sought were subject to disclosure.  See id. at 436-442.  The remaining cases cited by Judicial Watch are distinguishable.  See Miller, 129 F.3d at 837-38 (holding that requiring second notice by individual plaintiff after first notice by organizational plaintiff on same violation, when state had made clear by executive order that it would not comply, would be futile); King, 993 F. Supp. 2d at 922-23 (applying Miller and holding that plaintiff True the Vote's claim should not be dismissed for lack of notice when coplaintiff Judicial Watch had properly noticed same violation); see also Scott, 771 F.3d at 835-36 (declining to apply Miller and limiting decision to its facts).

**IV.**   **Conclusion**

For the reasons set forth herein, the court will grant the county defendants'
motion to dismiss Counts I and II of Judicial Watch's complaint.  Dismissal will be
without prejudice and with leave to amend.


/S/ CHRISTOPHER C. CONNER
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania

Dated:     March 8, 2021